## No. 11,996.

GOODRICH, ET AL. *v.* UNION OIL COMPANY OF CALIFORNIA, ET AL.

Decided December 31, 1928. Rehearing denied February 25, 1929.

Mr. JOHN T. BOTTOM, Mr. M. W. SPAULDING, Mr. JAMES H. BROWN, for plaintiffs in error.

Mr. ROBERT D. HAWLEY, Mr. WINTON M. AULT, Mr. HENRY S. SHERMAN, Messrs. LEE, SHAW & BRYANS, Mr. THOMAS J. WARREN, Mr. HERBERT A. ALPERT, Mr. JERRY H. POWELL, for defendants in error.

*En Banc.*

MR. JUSTICE ADAMS delivered the opinion of the court.

SUIT to quiet title, brought by Goodrich and Shipp, against Union Oil Company, et al. Decree quieting title in defendants. Plaintiffs bring error. We refer to them as designated at the trial. After the cause was docketed in this court, certain defendants have moved to dismiss for want of jurisdiction on the ground that other defendants at the trial, whose interests are not severable, were not made parties to the cause on error, and not named in nor served with the scire facias.

Clement Z. Goodrich, one of the plaintiffs, homesteaded the land, and United States patent was issued to him under date of June 2, 1891. It was recorded in the office of the county clerk of Larimer county on August 27, 1910. He went to Wyoming in 1894, where he has since resided. Before going away, he had executed a trust deed, which was afterwards foreclosed, and through which defend-

ants claim title. Defendants also claim by virtue of a treasurer's deed issued for non-payment of taxes. Plaintiff Goodrich claims to have retained ownership and possession under a parol lease to an alleged tenant, one James D. Jameson. Plaintiffs say that Jameson was to have had the use of the land if he would pay the taxes on it, some of which he failed to pay, which resulted in its sale. Jameson died in the year 1912 or 1913. He was Goodrich's sister's father-in-law. In 1910, a lawyer who was then examining the title for other parties, discovered the omission of the recording of patent, and wrote to Goodrich. The latter did not reply, but went from Wyoming to Fort Collins, employed another attorney, bought an abstract of title, had it examined, found the property had been sold, went to the land, saw alfalfa on it, also cultivation and improvements by the then owners, but Goodrich did nothing about it. He did not disclose his alleged ownership or possession to any one from 1893 to 1923, except perhaps to a few close friends. About 1922 or 1923, an oil excitement broke out in Larimer county, and it became evident that the property in controversy was valuable for oil and gas purposes. It is said to be worth not less than three hundred thousand dollars. Shipp, Goodrich's co-plaintiff, is a lawyer practicing in the state of Wyoming. In 1923, Goodrich conferred with Shipp, and as a result the latter procured from Goodrich a so-called power of attorney coupled with an interest, and had it recorded in Larimer county on December 19, 1923. Shipp made an unsuccessful effort to get a settlement with Union Oil Company, one of the defendants. Later, according to Goodrich, some other lawyer not connected with this case told him to get possession. On February 18, 1926, after dark, Goodrich attempted to comply with the advice by carting out a small structure to the place on a truck, and putting some dirt around the sides. He said also that "I tacked up a little fence down there, on the side around there by Fritz's, down by the lake there." The lake appears to be a reservoir used for ir-

rigating purposes by one of the owners of the land. Goodrich took with him an assistant by the name of Lunblau. Lunblau was armed. Goodrich said, "I didn't leave no orders. I just told him to stay there and see that nobody moved us off." In answer to the question, "Why did you want somebody with you?" Goodrich answered, "Well, I thought probably some of them Union Oil Company fellows might come around, and fire me off." He stayed on the place about six nights and left Lunblau in charge. Their presence was discovered, and it was reported to the oil company that when Lunblau was requested to get off the property, he said he would not, that he was there guarding the place, and that he did not want any trouble, or he didn't want to kill anybody, but that he would shoot enough to keep the boys busy, if he was interfered with. Lunblau's statements were admitted to be hearsay, but he was removed and put in jail under a writ issued by a justice of the peace on a criminal complaint. Plaintiffs claim to have had some further possession initiated under the same acts, also constructive possession through Jameson. Plaintiffs filed suit in the district court on March 2, 1926.

Some of the instruments of record in the county clerk's office showing how the title passed out of Goodrich and subsequently became vested in defendants are as follows: August 28, 1893, trust deed from Goodrich to Fred E. Smith, trustee, to secure payment of notes; November 28, 1898, tax deed from county treasurer to James D. Jameson; August 29, 1901, trustee's deed, from Smith, trustee, to Jameson; January 27, 1902, warranty deed from Jameson to Wm. T. Seamans; July 3, 1909, sheriff's certificate of purchase, followed by sheriff's deed, under an execution against Seamans; July 14, 1910, quitclaim deed from Seamans to one of defendants' remote grantors. From thence on to June 1, 1925, defendants' chain of title is shown by numerous warranty and quitclaim deeds; a decree of foreclosure in the year 1915 in the district court of Larimer county; a deed from a trustee in bankruptcy,

executed in 1914 pursuant to order of the United States court, involving the bankrupt estate of a former owner; four administrator's deeds, from L. C. Moore, as administrator of the estate of Russell W. Fleming, deceased, pursuant to orders of the probate court; also an oil and gas lease, and several assignments thereof, and also royalty interests in some of the defendants.

1. In the consideration of this case, we have before us the transcript of record, consisting of three large volumes, and two volumes of the abstract with 1983 folios on 806 printed pages, followed by 109 assignments of error which cover 46 additional pages. There are 578 pages of plaintiffs' briefs, besides defendants'. The case was orally argued.

We have come upon expressive language of United States Circuit Judge Adams of the Eighth Circuit, quoting from the Supreme Court of the United States, which is appropriate to this case. The learned jurist said this:

"There are 78 assignments of error in this case, but, in our opinion, very few questions presented on the record for consideration. The practice of filing such a large number of assignments cannot be approved. It thwarts the purpose sought to be subserved by the rule requiring any assignments. It points to nothing. It leaves opposing counsel and the court as much in the dark concerning what is relied on for error as if no assignments were filed.

"Mr. Justice Miller, in *Phillips, etc., Const. Co. v. Seymour*, 91 U. S. 646, 648, 23 L. Ed. 341, says:

" 'The object of the rule requiring an assignment of errors is to enable the court and opposing counsel to see on what points the plaintiff's counsel intend to ask a reversal of the judgment, and to limit the discussion to those points. This practice of unlimited assignments is a perversion of the rule, defeating all its purposes, bewildering the counsel of the other side, and leaving the court to gather from a brief, often as prolix as the assignments of error, which of the latter are really relied on.

We can only try to respond to such points made by counsel as seem to be material to the judgment which we must render.' " *Michigan Home Colony Co. v. Tabor,* 141 Fed. 332, 333, 334.

We adopt the above words without modification, except to note that in the Michigan Home Colony case, supra, there were 78 assignments of error, while here there are 109. There are 12 grounds alleged in plaintiffs' motion for a new trial. The added grounds in the assignments of error apparently came about through the employment of additional counsel for plaintiffs in this court, but we have often said that we do not consider assignments of error on grounds which the trial court has not had an opportunity to consider, when a motion for a new trial has not been dispensed with by court order. Plaintiffs have not been prejudiced, however, through lack of forethought, for we do not find any of the assignments to be well taken.

2. We cannot grant the motion to dismiss for want of jurisdiction. This court has complete jurisdiction over the subject matter, and over the persons of all defendants except two, Thomas S. Harrison individually, and as trustee. It was acquired by a voluntary general appearance in this court made by the attorneys for defendants in this case. The decree quiets title in twenty defendants. Some of them were designated in the district court as unknown, but they appeared and answered and had their rights decreed. Plaintiffs' counsel made the mistake of continuing to designate them as "unknown" in this court; they were not named in the scire facias; their interests are not severable; they are indispensable parties. As they are such, the failure to make them parties would ordinarily be fatal to the writ. 3 C. J. 1014, section 970; 2 R. C. L. page 68, section 50; 2 Ency. Pl. and Pr. page 192; *Chapman v. Pocock,* 7 Colo. 204, 3 Pac. 219; *Quimby v. Boyd,* 8 Colo. 194, 201, 6 Pac. 462. But the voluntary general appearance entered in this court by attorneys on behalf of the absentees, cures the

defect in service. *Rudolph v. Rudolph,* 50 Colo. 243, 245, 114 Pac. 977. We do not confuse an appearance at nisi with an appearance on review. It happens many times that a retainer for the trial is for that purpose only. "A writ of error is a new suit." *Rudolph v. Rudolph, supra,* and cases there cited. An attempt has been made to fasten on Mr. Hawley, one of the attorneys for some of the defendants, an acceptance by him of service for all, but actual or constructive service cannot be dispensed with by an acceptance of service for all or any unknown parties, nor do we attribute to him any such intention. We accept and believe his affidavit that he represents only three defendants. He was forced to file it in counter to the charge that he represents them all. But we find that on May 18, 1928, a petition relating to this case was filed in this court by seven of the staff of counsel on behalf of defendants, expressly naming fourteen of the previously unknown defendants, and some of the previously known. The case was then pending here. The petition begins, "Come now the defendants in error," and follows with their names, and is signed by the attorneys for them. There are so many defendants, and their interests are so involved and interlocked, that we think counsel for defendants must have overlooked this appearance. The record and briefs amply safeguard the rights of all, so no harm has been done. The Harrison interests are the only ones not represented by counsel in this court. Such interests are small, but this does not relieve us of the duty of ascertaining and protecting them. *Mountain States Beet Growers' Marketing Ass'n v. Monroe,* 84 Colo. 300, 269 Pac. 886, 890; *Montana Co. v. St. Louis Mining and Milling Co.,* 152 U. S. 160, 170, 14 S. Ct. 506, 509, 38 L. Ed. 398. A reversal or modification of the decree would injuriously affect Harrison, but since we do not do this, and on the contrary affirm the decree in its entirety, we deem it best to consider the case on its merits. We are further brought to this determination by

the injury that might result to him and all other parties by further delay.

3. Goodrich has had no valid claim after he was closed out by treasurer's deed and foreclosure, but if he had possessed a right since then, he has lost it by gross laches. In support of this conclusion, we refer to our statement of facts. Defendants and their grantors have made large expenditures. Indeed, it is this very fact, and the fruits of their industry and enterprise, that have unquestionably excited Goodrich's cupidity. He cannot reap where others have sown during his somnolence over a period of almost a third of a century. As to Shipp, a lawyer, if he did not examine an abstract of title to the land before he put himself and others to so much trouble, it is, to say the least, unfortunate. He could have there found all that was necessary for him to know, and facts putting him on inquiry as to all that he knows now, if he had made an examination. All that he has is a "power of attorney coupled with an interest"—in nothing.

4. We must advert. to other striking features of this case. We remark on Goodrich's testimony on cross-examination, to effect that when he went on the place with Lunblau in 1926 and attempted to take possession, he was following the advice of a lawyer. It seems strange that an attorney should have advised Goodrich to get possession, if he was already in possession. We do not mean to attempt to fix a definite time, or any particular time, that a plaintiff is required to have been in possession when he brings a suit to quiet title, but we do mean that in such a proceeding, which is analogous to a bill quia timet under the old practice, the possession, whether actual or constructive, must have the merit of bona fides. Imagination cannot bridge the gaps over the years involved in plaintiff Goodrich's story of possession. We have also in mind the many years that the evidence shows that the defendants and their predecessors in title are and have been in the open, notorious, continuous and exclusive possession of the premises, adverse to plaintiffs

and all other persons, as alleged in their pleadings. The respective answers of the defendants, containing these allegations, are sustained by the proof, and are credited and approved by direct reference in the decree which we affirm.

5. If plaintiffs desire us to credit their story of possession by virtue of an oral lease with James D. Jameson back in the early nineties—a so-called "lease" continued by fiction indefinitely, although Jameson died thirteen or fourteen years before the suit was commenced—we say that under these circumstances it appears odd that Goodrich should have found it necessary to jump his own pretended claim in 1926. At best, his restless and peripatetic habitation, carted by night on a truck to defendants' property, could scarcely carry his possession back to a time before the horseless age, when President Harrison caused Goodrich's government patent to issue. He acquired no right by his nocturnal escapade. He and Lunblau were there armed; they were wanton trespassers, and for an avowed purpose that was unlawful. They were rightly evicted by process of law.

6. Goodrich has seriously impaired his own credibility as a witness. He expressly denied under oath in his replication, a material fact that he knew to be true, that he had executed a deed of trust to Smith, trustee, in 1893. He willfully and deliberately persisted in this dissimulation on the stand, but the execution of the instrument by him was proven by overwhelming and conclusive proof. Defendants were forced to prove this and other things, which, in good conscience, Goodrich ought to have admitted, but denied. We are obliged to say that even in print, his answers to pertinent questions on cross-examination appear to be evasive and contradictory. His memory was subtly obscure as to facts detrimental to himself, but it was vivid and alert with details of a parol agreement alleged to have been made over 30 years before the suit, with a man many years in his grave. It was

"the weakest of all evidence." *Fagan v. Fisher*, 74 Colo. 473, 475, 222 Pac. 647; *Piggott v. Brown*, 79 Colo. 11, 16, 243 Pac. 626. It was more than weak in the present case, due to Goodrich's willful attempt to conceal material facts.

7. We do not doubt that the conduct of the plaintiff witness was exceedingly obnoxious to the trial court, just as it cannot help but be to us. He and his co-plaintiff even assign as ground for reversal the fact that the trial court admitted certain evidence, the trust deed, a certified copy of which with other oral and documentary evidence defendants were compelled to offer to refute Goodrich's manifestly incorrect statements. Some of the facts recited here may seem harsh, but they are from the record, and we fear that courts may have been sometimes too politely tolerant toward those whose lips speak guile when their own interests are involved. Goodrich has exuded such an atmosphere of discredibility even before this court of review, by his impossible conduct, that we feel justified in losing interest in arguments based on the hypothesis of the truth of his statements. We have referred to only a part of his testimony that has created this impression.

8. Counsel for plaintiffs are mistaken in saying, in their twenty-second assignment of error that "There is absolutely nothing in the deed of trust so-called (from Goodrich to Smith, trustee) with reference to any certain notes aggregating $1,125.00." They will find it in the second paragraph of the deed of trust, Defendants' Exhibit 12, folio 914. They are also mistaken in saying in the same assignment, "that it now appears from the record that the title to this land at the time of the pretended execution of this deed of trust was not in Clement Z. Goodrich, but during that particular time was in George L. Jameson * * *." George L. Jameson died in Goodrich's house in Wyoming, several years before the trial. He was Goodrich's brother-in-law, and a son of

James D. Jameson, deceased. It is a fact that Goodrich deeded the land in controversy to George L. Jameson on April 8, 1891. (Plaintiffs' Exhibit B, folio 620.) But on August 24, 1893, he deeded it back to Goodrich. Plaintiffs themselves introduced this deed in evidence, as well as Exhibit B. (Plaintiffs' Exhibit C, folio 624.) Goodrich signed, acknowledged and delivered the trust deed on August 28, 1893, four days after the Jameson deed to him. (Defendants' Exhibit 12, folio 914.) Furthermore, if counsel's statements were correct, this alone would dispose of plaintiffs' case, for Goodrich would have no deed to rely on, even as late as 1893. We do not attribute any intentional misstatement to counsel. The attorney for plaintiffs who did most of the work of preparing the cause for review, did not appear at the trial. He took the case as he found it and has diligently worked up hill.

9. It would be useless to prolong this discussion, for it would only lead to the same result. There are no grounds for reversal. Many grounds of affirmance have been suggested, but we shall rely on only three: (1) Gross laches; (2) no possession in plaintiffs at the time of bringing their suit to quiet title; and (3) no title in plaintiffs. It is the law in suits of this nature that the plaintiffs must rely on the strength of their own title, and not on the weakness or supposed weakness of their adversaries'. This simply means that when plaintiffs have no title or interest of their own, defendants' title or interest is not their concern. We have so held before. *MacKay v. Silliman,* 84 Colo. 220, 269 Pac. 901. It is a rule of law made for the peace and good order of society. Its violation here has brought grief to plaintiffs, untold injury to defendants, unnecessary work for the courts, and useless expense to the county and state.

Judgment affirmed.

MR. CHIEF JUSTICE DENISON and MR. JUSTICE ALTER not participating.

## On Rehearing.

Per Curiam.

Our rule 48 provides: "Application for rehearing shall be by petition, signed by counsel, briefly stating the points supposed to have been overlooked or misapprehended by the court, with proper reference to the particular portion of the abstract and brief and with any authorities relied upon. Such petition shall be filed within fifteen days after the filing of the opinion, and shall, except when the decision was on application for supersedeas, be printed in conformity to the rules as to printed briefs. No answer thereto will be permitted and no action thereon will be taken by the court save to grant or deny the rehearing. In no case will argument be permitted in support of such petition. This rule will be strictly enforced, and any petition in violation thereof will be stricken from the files."

We granted a request for an extension of time within which to file a petition for rehearing, and have been rewarded by the filing of a mislabelled petition on behalf of plaintiffs, consisting largely of an original diatribe, and innuendoes impugning the integrity of the honorable trial judge, and also distorting the meaning of our words and upbraiding the members of this court because we have been unable to agree with counsel for plaintiffs, or to see the case as they see it. The document was so unjustifiable and impertinent, that by unanimous vote, this court en banc promptly directed that offending counsel, Mr. Spaulding and Mr. James H. Brown, be ordered to show cause why they should not be punished as for contempt, for filing a sham, frivolous and contemptuous petition over their signatures. To this citation they have since made answer.

The attorney last named appeared for the first time on the petition for rehearing. His tardy entrance into the case may account for the fact that among all of plaintiff Goodrich's counsel, he is undoubtedly the least in-

formed as to the state of the record, and the law applicable thereto. However, neither this fact, nor counsel's disappointment at the outcome of a lost cause, justify either him or his collaborator on the petition for rehearing, in their gross abuse of the patient consideration accorded the attorneys by the district court and this court, while counsel presented a case that it has developed is utterly destitute of merit.

The files of this court contain seven petitions filed from time to time, signed by Mr. Spaulding and his associate, asking for a suspension of our rules so as to allow them extensions and more extensions of time. There were two like petitions from counsel for defendants, the latter having been made necessary by the prolixity of plaintiffs' brief. The above requests were all granted, but the time allowed plaintiffs in some instances was not as long as they wanted. We were finally obliged to curtail counsel for plaintiffs in their requests that had become habitual. Counsel for defendants protested at the delay and loss of time, and postponement of drilling operations since the year 1926, caused by plaintiffs' suit and dilatory tactics. It was only to give the parties every opportunity for a full hearing, that they were thus courteously indulged by the court.

In the main opinion above, we called attention to certain gross and reckless misquotations of the record by counsel for plaintiffs. We pointed out some of the errors by folio references. Mr. Spaulding, in motions here on file, has repeatedly assumed responsibilty for the preparation of the cause in this court. We were loath to believe counsel guilty of intentionally attempting to mislead the court, and we so stated, though such conduct of counsel shook our confidence in the dependability of his statements. We felt that his pen outran his thoughts, and his desires the stubborn facts. But on petition for rehearing, there was no apology or attempt at explanation of such misstatements, but on the contrary it contained a repetition and aggravation of the offense,

couched in general and more or less incoherent but insolent language, coupled with a flagrant disregard of our rules.

That plaintiffs' plea of non est factum concerning the trust deed executed by Goodrich, was a sham, as we have said in our opinion, is unwittingly confirmed by a further pretense in the petition for rehearing. Counsel unsuccessfully attempt to convince us that the five notes secured by the trust deed were paid, but an attempt to show that the debt was paid is an admission of the original debt. It is absurd to say as they do, that "all these trust deeds as well as chattel mortgage notes were paid," if there was no trust deed. This principle of law and logic has been repeatedly announced by the courts. *Mohr v. Barnes,* 4 Colo. 350; *Greenlees v. Chezik,* 68 Colo. 521, 522, 190 Pac. 667; *McMahon v. Williams,* 80 Colo. 249, 250, 250 Pac. 560. The trust deed was foreclosed to satisfy the balance due.

Goodrich built a house of cards on the sands of make-believe, and his counsel have unduly trifled with the court in a suit that ought never to have been brought. We are unanimous in our opinion that the judgment should be affirmed. The only point on which the justices have slightly differed pertains to the extent to which leniency or severity should be exercised. Counsel have now purged themselves of contempt by an apology as full and complete as they are apparently capable of offering. It is accepted. It is only fair to say that Mr. Bottom's name does not appear on the petition for rehearing, and nothing here said is intended to apply to him.

The petition for rehearing is denied and stricken from the files for gross violation of the rules.

Petition for rehearing denied.