## No. 12,113.

Wilder *v.* People.

Decided April 29, 1929. Rehearing denied June 10, 1929.

Mr. C. F. Clay, Mr. Horace N. Hawkins, for plaintiff in error.

Mr. William L. Boatright, Attorney General, Mr William W. Gaunt, Assistant, for the people.

*En Banc.*

Mr. Justice Burke delivered the opinion of the court.

A joint information of three counts was filed against plaintiff in error, hereinafter referred to as defendant, and his stepson, John S. Eckman, charging them with violating the liquor law. The first count charged possession, the second operation, and the third ownership of a still for the manufacture of intoxicating liquor. By agreement defendant was separately tried. On a verdict of guilty on each count he was sentenced on each to a term of four to five years in the penitentiary, the sentences to run concurrently. To review that judgment he brings error.

We are advised by the assignments that the 304 pages of this abstract disclose 131 errors. Anent this situation we again refer to the comments of Judge Adams and Justice Miller, repeated by us with emphasis in *Goodrich v. Union Oil Co.,* 85 Colo. 218, 274 Pac. 935.

In the instant case, however, we have been spared much futile toil by an application for supersedeas and a stipulation of counsel. The application was presented on printed briefs and was allowed. Later a printed abstract was filed, and it was stipulated that the case should thus stand finally submitted. We shall, therefore, not look beyond the alleged errors argued in defendant's supersedeas brief, and these we will take up in chronological order rather than in the order of their argument. They

relate to: (1) Change of venue; (2) rulings on evidence; (3) statements made by the district attorney; (4) statements made by the trial judge; (5) instructions; and, (6) the fairness of the trial as a whole.

On the forenoon of December 17, 1927, the sheriff and others raided defendant's ranch in Arapahoe county. On a five acre tract, originally a part of the quarter section now owned by defendant, they found an underground still-house and therein two stills bearing unmistakable evidence of recent operation. The ranch house itself, where defendant and his stepson lived, was distant from this tract about one-quarter of a mile, and near it was a cattle yard. From the still-house to the cattle yard some one had recently walked in the new fallen snow. Mash covered articles of clothing were found in Eckman's room and empty whiskey kegs, pressure tanks, charcoal, and sacks of sugar in the granary and outhouses. One of these outhouses bore evidences of recent occupancy, and scribbled on its walls was the record of the operation of a still. The still-house obtained its water supply through a pipe line running to defendant's cattle yard. Defendant testified in his own behalf and admitted that he had long been cognizant of the illegal manufacture of intoxicating liquor on the premises above mentioned and of the source of the water supply therefor. He protested his innocence of any voluntary connection with, or acquiescence in, that crime, and in explanation of this anomalous situation told the jury a story which may be thus briefly summarized:

In 1923, the quarter section involved belonged to Mrs. Ethel Glenn Eckman, who had received her deed under the name "Glenn Eckman." There was a deed of trust outstanding against this property to secure an indebtedness then due. Mrs. Eckman borrowed of defendant the money to discharge this debt and as security therefor, and under the name of "Glenn Eckman," executed and delivered to defendant a warranty deed for the entire tract, which was not to be recorded unless necessary. The

next year Mrs. Eckman borrowed more money of defendant, giving a new note for the full amount under the same security. A year later defendant began to farm the place on shares and live at the ranch house. This arrangement continued until about the first of September, 1927. The preceding fall a stranger, giving the name of Lester Z. Johnston, appeared at the ranch house and bought of Mrs. Eckman the five acre tract, on which the still-house was later found, for $100 an acre plus $250 for the use of water to be drawn through the pipe line above mentioned, defendant orally waiving his mortgage thereon. Johnston paid $100 in cash and a written contract was entered into by the terms of which he was to receive his deed when he paid the balance. He said he was buying this land upon which to operate a muskrat farm. Thereupon Johnston departed. He returned about April 1, 1927, completed his contract and obtained his deed. Early in May following, defendant, after some weeks' absence, returned to the ranch and visited the Johnston tract. Hearing the roar of gasoline burners, and having been for four years chief of the state constabulary charged with the duty of detecting and bringing to justice violators of the liquor law, defendant knew he was in the vicinity of a still. He soon found the trap door leading to it. Through this Johnston suddenly appeared, armed, and with many oaths and repeated threats exacted from defendant a promise of silence and, following him to the house, in the same manner exacted a like promise from Mrs. Eckman and her son. In the latter part of that month defendant and Mrs. Eckman were married, and September 3, following, the wife was taken to a Denver hospital. Before going they together inspected her deed to defendant. The description therein read: ''The northwest quarter (N W 4) of section thirty-two (32) township five (5) south, range sixty-seven (67) west.''

In her presence and with her consent Wilder added thereto the following: ''Excepting and reserving from the grant five acres more or less, being 272¼ feet easterly

and westerly by 800 feet northerly and southerly along the creek on said land.'' The ''exception'' being a brief description of the property conveyed to Johnston. Thereupon the deed was redelivered to defendant as an absolute conveyance. The next day the wife died. October 13 of that year defendant's deed, now approximately four years old, was recorded. December 13 and 14 defendant thrashed and prior thereto had cleaned his granary for the storage of wheat. (It was under the wheat here stored at this thrashing that some of the illicit paraphernalia hereinbefore described was found.) December 15, two of his employes left, and he hired one ''Tony.'' When the raiders arrived on the 17th, Tony was there, but shortly disappeared and has not since been heard of. In addition to the foregoing, defendant offered to testify that between the time of his first discovery of this Johnston still and the time of the raid he had thrice conferred with an old friend, Judge George W. Allen (an aged lawyer and jurist of this state, then retired from active practice, and who died prior to the trial of this cause), by whom he was advised that no legal obligation rested upon him to violate the command which Johnston had enforced with a threat against his life, and with whom it was finally arranged that Judge Allen, without involving either himself or defendant, should take steps to cause the federal authorities to be informed of Johnston's illegal operations. This offer was excluded.

Of the exhibits referred to the original deed of the premises in question from one Richard W. Epley to Glenn Eckman, and the original deed from Glenn Eckman to defendant, are in evidence. The latter, save the printed portion, is entirely in the handwriting of defendant. A certified copy of the deed from Mrs. Eckman to Johnston is in evidence. It is signed ''E. G. Eckman,'' is dated January 4, 1927, and filed for record April 2, of that year. The alleged contract between Mrs. Eckman and Johnston rests entirely upon defendant's testimony. John S. Eckman was not called.

■ 1.  The motion for a change of venue was signed by counsel for defendant and verified by defendant himself.  It charged prejudice of the citizens and undue influence of the prosecution, and set forth in detail the alleged facts upon which those charges were based.  It was supported by three affidavits which briefly recited the prejudice but said nothing about undue influence and omitted all reference to the specific facts.  Three counter affidavits were filed which simply denied the prejudice and asserted that defendant could have a fair trial.  This was the entire showing.  The motion was overruled.  The granting or refusing of such a change rests generally in the sound discretion of the trial court.  *Power v. People*, 17 Colo. 178, 28 Pac. 1121.

■  The particular objection here made is that the state did not deny the specific facts.  Such denial was not indispensable.  Those "facts" related principally to newspaper articles and interviews.  They were material only as an evidence of prejudice.  Assuming their existence, we are here concerned only with their effect.  Though not denied their alleged effect; i. e., resulting prejudice, was.  The court found "no prejudice."  That finding is presumed correct unless the record discloses the contrary.  *Andrews v. People*, 33 Colo. 193, 79 Pac. 1031.

■  If the alleged prejudice existed it should appear from the examination of jurors.  *Giacomozzi v. People*, 72 Colo. 13, 209 Pac. 798.  If many jurors had disclosed a bias against defendant and hence been excused for cause, if that bias had in numerous instances been traced to adverse newspaper reports, or to the acquaintance, activity and influence of those interested in the prosecution, and if defendant had been obliged to exhaust his peremptory challenges, here would have been facts supporting the motion and suggesting a possible abuse of discretion in its denial.  But if the examination of jurors by counsel for the defendant clearly indicated counsel's loss of faith in the existence of that public antagonism

they had once asserted, and if no venireman on voir dire gave any hint that he had been touched by the alleged adverse prejudice, all presumptions are against its existence. On this subject, as on many others, we have not confined our investigation to the abstract, but have diligently searched the record proper and the bill of exceptions. For all that appears from either, the first twelve jurymen called were entirely satisfactory to both sides, and not a single challenge, peremptory or for cause, was exercised. In the face of that ominous silence this assignment becomes a meaningless protest.

2. Three alleged errors are urged concerning the admissions of evidence: (a) The exclusion of defendant's offer to show that he made a full and fair disclosure in good faith to Judge Allen and in good faith followed his advice; (b) the exclusion of defendant's offer to show, on the cross-examination of a witness called in rebuttal by the state, that Wilder had denied his guilt and offered an explanation of incriminating circumstances; (c) the exclusion of defendant's offer to testify as to his activities many years prior to his trial, and particularly as to his legislative service 20 years prior thereto.

■ ■ a. It is admitted that this evidence concerning advice of counsel goes only to the question of intent as that relates to the charge of operating a still. But since defendant was also found guilty of both ownership and possession, since the sentence on each charge was the same and all ran concurrently, and since we are of the opinion that the evidence was ample to sustain a conviction of both owning and possessing, a reversal on the conviction of operating would avail defendant nothing; hence the assignment need not be examined. Were it otherwise this objection would be unavailing. This defendant was permitted to explain in detail that he was coerced into allowing this still to operate, and take water from his plant, under threat of death. The jury was instructed that proof of his knowledge and silence was not proof of operation unless supplemented by proof of active partici-

pation. Since all reference to threats and fear was omitted by the court the instruction was more favorable to defendant than he could claim under his own evidence. Assuming the correctness of defendant's theory of the law, who, if anyone, told him his conduct was lawful, as well as his belief concerning that information, is wholly immaterial in the light of the fact that the court, in substance, told the jury that such conduct was free from criminality *unless* the evidence further showed "beyond a reasonable doubt active and intentional participation of some kind by the defendant on trial." If defendant did not so participate he could not, under these instructions, be convicted, regardless of threats and fear, regardless of his theory of the law, and regardless of any intent on his part to violate it. If he did so participate he was guilty of operating despite the truth of all his offered and rejected evidence. We pass no opinion upon that portion of the court's instruction last quoted. If error, it was in defendant's favor and it renders wholly inapplicable every authority cited by his counsel on this question.

■ b. In the outhouse which bore evidence of recent occupation certain food was found. The sheriff was called in rebuttal and testified that defendant denied knowledge of it. Thereupon counsel for Wilder sought to cross-examine on other subjects on the theory that Wilder's statements concerning them were a part of the same conversation. The evidence was rejected because not proper cross-examination. The ruling was correct. The general rule is that "the whole of a verbal utterance must be taken together." The reason is that otherwise it may be misinterpreted. Hence "the whole" relates only to the particular subject discussed, or thought expressed. 4 Wigmore on Evidence (2d Ed.), §2094. Where but a part of the statement or conversation is introduced the opponent may complete it, but in so doing he may put in only so much as relates to the same subject, aids construction, and is not independent testimony. Id.

§2113. A distinct or separate utterance is not receivable under the rule. Id. §2119.

■ c. The extent to which a defendant testifying in his own behalf may give to the jury his life's history, not directly connected with the charge, is generally discretionary with the trial court. Were it otherwise the question of guilt might be lost sight of in the trial of numerous collateral and immaterial issues. We cannot say that the court in the instant case abused that discretion in excluding evidence of defendant's employment many years prior to the date of the charge and which could have but the remotest, if any, bearing on the question of his guilt. If defendant's legislative service does not fall within the rule, the fact that at least three of his character witnesses testified thereto without objection, and that it stands in this record undenied by word, fact, or inference, precludes any possibility of prejudice.

■ 3. a. The district attorney, in objecting to evidence and in arguing that objection in the presence of the jury, used some questionable expressions. Under the particular circumstances here disclosed we think they were of little moment. Thereupon the jury was excused while objections were argued. On its return it was told by the court that counsel's statements should be disregarded. True, the statements were not quoted, nor the district attorney rebuked, nor mentioned by name; but since the court referred to "remarks made by counsel" "just before recess" we think the designations sufficiently specific and the error, if any, thereby cured.

■■ b. Defendant testified that he had once been employed by the Humphreys Oil Company. It appeared that one of his witnesses had been a director in that company, two others stockholders, another secretary to Colonel Humphreys and to the Humphreys Foundation, and that Mr. Clay, one of his attorneys, was attorney for said oil company. It is asserted in the brief of his counsel that the story of certain national scandals relating to oil and oil lands and involving the names of Doheny and Sin-

clair, was running in the public press while this trial was in progress. These facts were apparently used by the district attorney in his closing argument as a basis for certain remarks about "oil," "oil men," and "a streak of oil," and the parting injunction to the jurors to "do your duty irrespective of whether it is Doheny, Sinclair, or whoever it may be." He had likewise referred to one of defendant's witnesses as being "the man who is with the oil company," a statement unsupported in the evidence. No objection was made to this argument at the time. "Ordinarily, the failure of counsel to object to such language at the time it was used precludes him, in case the verdict is unfavorable, from a review in an appellate tribunal." *Gilstrap v. People,* 30 Colo. 265, 268, 70 Pac. 325. The general rule is admitted, but it is said this is an exceptional case because other portions of the record demonstrate that any protest would not only have been futile but would have resulted in further prejudice. We do not so read the record. In the Gilstrap case, supra, the reason urged to support an exception was more persuasive than the one now presented, but Chief Justice Campbell, speaking for the court, found it unavailing. Were it otherwise this reason could not here be accepted. It often happens that objections made and overruled have a tendency to prejudice the party making them, but that fact has never, to our knowledge, been considered by an appellate court as justification for its consideration of points not raised by proper objection. In the instant case, as soon as the jury retired, defendant's counsel took precautions to see that the objectionable statements had been taken down by the reporter and thus made available in support of a motion for a new trial and a writ of error. They might then, without incurring the danger complained of, have requested that the jury be recalled and instructed to disregard this objectionable argument. No such request was made. "Is there," we are asked in defendant's closing brief, "a hard and fast rule that the court cannot in any case review the evil conduct of a

prosecuting official in the absence of objection thereto?" There is no such rule. Had this defendant, in our opinion, been convicted of a crime of which he was probably innocent, we would unhesitatingly exercise our discretion to notice errors probably prejudicial though not properly saved. This is not such a case.

4. During the cross-examination of defendant the presiding judge addressed to someone, presumably to him, the interrogatory, "Is it going to hurt you to answer?" This, it is said, is equivalent to the judge's accusation that the witness was evading. The record shows beyond peradventure of a doubt that the witness was, and had for a long time been, evading. He had been asked if, on any one of three days, he told any officer that Exhibit "U" was his property, and a "Yes" or "No" answer was demanded. His counsel, by specific objection, pointed out that such an answer was impossible, but when the objection was overruled the witness answered, "I did." He was then asked what officer he told. His counsel again pointed out the presumed impossibility of an answer, but when the objection was overruled the witness stated that three or four were present, and he could not tell to which one he made the remark. The district attorney then called certain officers by name and asked the witness as to each of them. His answer was that there were three or four present and he could not tell. Then asked if more than one was present, he answered, "I think so." Asked then to name an officer who was present, he answered, "I can't tell you." Asked if he could not name a single one, his counsel again protested, saying that the witness had four times answered and that nothing could be plainer than his statement, "when he says he can't answer." But when the objection was overruled the witness said, "I can give you the names of all of them that were there." When it became apparent that this information was about to be demanded an objection was again made, "because he has answered that seven times." "He has answered he didn't know, and can't tell, every time."

When that objection was overruled and defendant stated that there were six or eight officers present, he was called upon to name one of them. This question was met by his counsel by the same objection and explanation. The objection was overruled and the witness said: "The only way I can answer is to name them all, and tell you which ones were there." The Court: "Answer the question." The Witness: "I told him I didn't know the particular man." Here followed the court's interrogatory, to which objection is made. It brought no answer. The district attorney then inquired of the court, "Will you instruct this witness to obey the rulings of the court?" This was followed by another objection and this by some disagreement between the court and counsel for the defense. A recess was then taken, apparently to relieve the nervous tension. The subject was never returned to and the witness never did answer the question. Trial judges are neither required nor expected to be superhuman, and the judge who could maintain his composure through an almost endless experience of this kind would be rare indeed. The remark was ill-advised, but the responsibility for it rests with counsel, who presented repeated objections after they had been repeatedly ruled upon, and his client whose shifty, evasive, reluctant testimony crowded human endurance to the breaking point. Prejudice cannot be predicated on such an error so produced.

5. a. Defendant's requested instructions Nos. 13, 14, 15, 16, 18, 19, 26 and 28 all relate to defendant's defense to the charge of operating a still. They are immaterial on the question of ownership or possession and hence need not be examined for reasons heretofore given.

b. Defendant's requested instruction No. 11 contained the statement that the prosecution relied upon circumstantial evidence, but since the court gave a proper definition of circumstantial evidence, and no man of average intelligence could for a moment doubt that all of the people's evidence fell within the definition, the omission could by no possible construction be held error.

█ c. Defendant's requested instruction No. 10 refused, told the jurors they must acquit if they could explain the evidence upon any reasonable theory of defendant's innocence. But the court's instruction No. 11 advised them that before they could convict they must find the circumstances "inconsistent with any other reasonable hypothesis than that of defendant's guilt." We fail to see the distinction.

d. Defendant's requested instructions Nos. 29 and 30, on the effect of character evidence, were refused. The subject was, however, fully covered by the court's instruction No. 16, which is objected to only because it closed with the admonition that if on all the evidence the jurors believed the defendant guilty beyond a reasonable doubt, "you will not acquit solely upon the ground of such good character." We find no fault with the instruction given, nor any authority even suggesting that it is deficient. The refused instructions being mere statements, in other language, of the same principle, were properly refused.

e. Defendant's requested instruction No. 5 on presumption of innocence was refused, and in lieu thereof the court gave instruction No. 8, which is the usual and approved instruction on that subject in this jurisdiction. It has become "stock" in practically every court of record in Colorado. It contains everything on this subject which a defendant is ordinarily entitled to have given to a jury, and certainly all this defendant was entitled to have. It is here objected to because of an alleged "cracker" which is merely an explanation of the reason for the rule. Other similar instructions would often promote, rather than frustrate, justice, if equipped with such a cracker.

f. The foregoing applies equally to defendant's requested instruction No. 6 on the subject of reasonable doubt. It was refused and in lieu thereof the court's instruction No. 9 was given. These require no further comment.

g. Defendant's requested instruction No. 9 advised

the jurors that the charge "cannot be established by mere suspicion, nor by relationship or association between the parties." This was properly refused because fully covered. These jurors were correctly instructed on burden of proof, reasonable doubt, criminal intent, presumption of innocence, circumstantial evidence, and credibility of witnesses. If, despite all these, enforced by their oath, any one of them would still vote "guilty" on "mere suspicion," "relationship or association," no conceivable instruction could penetrate his ignorance or curb his dishonesty. The giving of an incorrect statement of law is always error, but whether the refusal to give a correct one is such, can only be determined by an examination of the whole charge.

h. Defendant's requested instruction No. 25, which was refused, advised the jurors that *Wilder's* deed, if and when held only as security, conveyed no title. It was of course fully covered by the court's No. 13 to the effect that *a* deed so held conveyed no title.

i. Defendant's requested instruction No. 8 required proof of ownership of the still before conviction of ownership. It was fully covered and wholly superfluous.

j. Defendant's requested instructions Nos. 31 and 32 were properly refused. They point the law's finger of suspicion at the testimony of its officers and warn the jury that great care should be used in weighing that testimony by reason of that relationship. They are unsupported by statute or decision in this jurisdiction, or by reason anywhere.

k. Defendant's requested instruction No. 33 was refused. It is a direct warning to each individual juror to "refuse to agree to a verdict of guilty unless the juror personally believes that the evidence has shown the defendant to be guilty beyond a reasonable doubt." Authorities in support of a similar instruction are cited from Alabama, Missouri, Michigan, Indiana, Kansas and California. In several of these cases the jury was not otherwise told, as here, that proof of guilt must be made

beyond a reasonable doubt, and in others the rule was not applied, as here, to "every material allegation." In still others it is held improper to repeat the instruction as to each juror and each link. The instruction here given was: "The burden of proof is upon the people to prove each and every material allegation in each of the count or counts in the information contained, to your satisfaction beyond a reasonable doubt, and if the people have failed to so prove any one or more of the material allegations in any one or more counts of the information you will find the defendant not guilty as to such count or counts so failed to be proven."

As said by the Supreme Court of Kansas, "it is hardly necessary to instruct an American jury touching their right to disagree." If each need be cautioned not to yield his doubt on the question of guilt, he ought with equal reason be so cautioned as to each essential element thereof. Thereafter, lest all this be construed by the juror into a demand for an acquittal, they should be further informed that such a verdict could not be returned unless each entertained a reasonable doubt. Such is the logical end of this process of refinement and such the result reached in some of these jurisdictions. *State v. Rogers*, 56 Kan. 362, 43 Pac. 256. We think the instruction above quoted sufficient.

6. The claim of unfair trial, so far as it is not hereinbefore specifically covered, rests largely upon the contention that defendant's theory of the admitted facts was not given to the jury in any instruction. This rests upon the further contention that that theory was absence of criminal intent to operate, or become accessory to the operation of the still in question, as evidenced by the threats of Johnston, the fear they induced, the consultation with Judge Allen, the disclosures made to him, and the acceptance in good faith of his advice. We think all this is disposed of by what we said in section a, of paragraph 2, supra. It is further asserted, but not argued, that there was proof neither of ownership nor

possession. In the last mentioned section and paragraph ' we have expressed the contrary opinion. That opinion, we feel, should here be fortified by reference to some of the things which stand out in this record in its support and which we doubt not led the jury to the same conclusion.

"Johnston" has all the earmarks of an accomplice or a myth. He appeared from the unknown and vanished into it. The record contains no suggestion of a reason for his selection of this particular ranch for his operations, or for his purchase of a part of it at such a price, or for the desperate risk he must have known he took when he opened a distillery under the very nose of a former prohibition officer whose silence he had no hope of securing save by a threat of death. This ex-member of the general assembly of Colorado, with four years' experience as head of the state constabulary, must have known that there was an ever present prospect of the discovery of these moonshining operations, and that such was his apparent relation thereto that, once discovered, he stood at the door of the penitentiary. Moreover, his own position, unenviable as it was, did not approach the brink where his stepson and employee, Eckman, stood, with guilty footprints and mash stained clothing. Assuming defendant guiltless, his servility is incomprehensible. It is almost unbelievable that the mouths of the only persons, save Eckman, who ever saw Johnston, and the only persons to whom defendant, before the raid, ever communicated the facts of his precarious existence should, prior to the time when he was called upon to make public his story, have been stopped by the hand of death. It is more than strange that the description and exception in defendant's deed, which he says were written four years apart and could not therefore have been executed with the same pen and ink, bear such internal evidence of having been written at the same time and place, by the same hand, and with the same ink, that no ordinary business man, submitting them to a casual examination, would

suspect the contrary. Finally, if Johnston stored the equipment for his illicit operations more than a quarter of a mile from the scene thereof, and off his own land, and in the granary and under the wheat and near the residence of enemies whose silence he was only holding by the uncertain thread of a death threat, then Johnston was a curiosity even among bootleggers. We cannot escape the conclusion that the jurors were convinced that while one or more of these anomalous assertions might possibly have been true, reason revolted at the assumption that all could be, and that they properly concluded that Wilder was in fact the owner of the five acre tract.

We think the verdict on each count is supported by the evidence and the record discloses no error, not waived, which could possibly be prejudicial. The judgment is accordinlgy affirmed.

MR. CHIEF JUSTICE WHITFORD and MR. JUSTICE CAMPBELL not participating.

MR. JUSTICE ADAMS sitting for MR. CHIEF JUSTICE WHITFORD.