## No. 17,762.

### FRANK EDWARD LUTZ *v.* PEOPLE OF THE STATE OF COLORADO.

(293 P. [2d] 646)

Decided February 14, 1956.

Mr. ISAAC MELLMAN, Mr. GERALD MELLMAN, for plaintiff in error.

Mr. DUKE W. DUNBAR, Attorney General, Mr. FRANK E. HICKEY, Deputy, Mr. NORMAN H. COMSTOCK, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE KNAUSS delivered the opinion of the Court.

PLAINTIFF in error, herein referred to as defendant, was charged with the murder of his wife, Rose Mary Lutz. On motion of counsel for defendant, at the close of all the evidence, the question of first degree murder was withdrawn from consideration of the jury and the case submitted upon instructions embracing second degree murder, voluntary and involuntary manslaughter and excusable homicide. The jury returned a verdict finding defendant guilty of murder in the second degree and he was sentenced to a term in the state penitentiary. He brings the case here by writ of error, seeking reversal of the judgment.

Defendant, a former resident of Hooper, Colorado, left that community in 1948 or 1949 and was stationed at Lowry Air Force Base in Denver, Colorado, on February 12, 1954, the date on which his wife met death as a

result of a gunshot wound. Defendant married Rose Mary February 28, 1952. After leaving Hooper defendant joined the armed forces and was stationed at McCord, Washington, Lowry Field and other places, and for a short period saw service in Korea.

There were no eye witnesses to the shooting which resulted in the death of Mrs. Lutz. The People relied on a written statement of defendant concerning the events which led to the homicide and the exhibits which the police officers obtained at the scene. Defendant admitted in his signed statement, as well as upon the witness stand, that he held the gun when his wife was killed.

It appears that on the night in question, defendant called for his wife at the place where she was employed at about ten o'clock, but failed to contact her. He then went to the family home where the wife arrived a short time later. An argument ensued. The deceased had spoken of her intention to obtain a divorce from defendant. He said she insisted that defendant stay away from the premises where she resided. Defendant answered that he was paying the rent on the place and saw no reason for him to move. He called his wife's attention to the fact that her brother resided there, paid rent only and nothing for groceries unless he, her brother, felt like it. They got into an argument which lasted for some ten minutes, when his wife got up and obtained the gun—an 8 mm. Mauser rifle—and told him to get out or she would call the police, she was seated in a chair holding the gun, which defendant testified was never aimed at him by the deceased. He grabbed it from her. In his statement to the police defendant stated "and pretty soon, I don't know, I just got up and shot her." He said that she would not have shot him; that he just jerked the rifle away from her and turned the gun on her, shot her once and then shot himself in the face. He said he and his wife had some family difficulties, the main one being over damage which he did to an automobile belonging to the parties. Defendant told one

of the witnesses, called by the People, that on the afternoon of February 12, 1954, his wife was going to divorce him because he wrecked the automobile and because of his drinking. He also told this witness that he had been advised by persons at Lowry Air Force Base to go home and give his wife "basic training" so that she wouldn't talk. The name Rose was mentioned in this telephone conversation, and defendant asked the witness, Emmile A. DeBell, referring to the Archina case, what she thought of it, to which she replied that she did not live in North Denver and did not know; that defendant then replied: "Well, it's just too bad he didn't have one more shot to shoot that Rose up - - -."

A few days after the death of Mrs. Lutz, defendant made and signed a statement to police officers, which statement was introduced in evidence without objection. Concerning it, defendant on the trial testified that it was freely and voluntarily given. In this statement defendant said that he and his wife had "a fairly hot argument" when the deceased got the gun and sat in a chair, some five or six feet from defendant, with the gun in her lap.

He said in this statement: "We sat there, and argued a while and pretty soon, I don't know, I just got up and shot her. Q. Did she have the gun in her lap in her possession when you grabbed it from her? A. Yes. Q. Was there any disturbance or fight over the possession of the gun? A. No. She wouldn't have shot me anyway, I just jerked it away from her. Q. When you jerked the gun away from Rosemary, did you then turn the gun on Rosemary and shoot her? A. Yes.

Q. Then after you shot Rosemary, what did you then do? A. I pulled the gun and shot myself here (indicating). Q. Before you shot Rosemary, with this rifle, did she make any attempt to shoot you with the rifle? A. No. Q. Did she make any threats that she might shoot you? A. No. Q. You were a little angry with your wife, Mr. Lutz, because she had, you believed, reported you

to the Military Police? A. Well, I wasn't very happy about it, no."

On the trial defendant testified that his wife was sitting when she was shot and was from two to six feet away from him.

It is contended that the trial court erred in certain particulars, which we summarize as follows:

1. In refusing offers of proof of the good character of defendant while he resided at Hooper.

2. In refusing to give an instruction as to defendant's theory of the case.

3. In submitting the matter of second degree murder to the jury.

4. Permitting improper reference to the Archina shooting.

■ A defendant in a criminal prosecution may introduce evidence of his good character and reputation provided such testimony is confined to the particular traits involved in the offense charged and is not too remote. The limit of time which would make such evidence too remote, hence inadmissible, cannot be fixed definitely and each case must of necessity depend on its own facts and circumstances, the matter resting in the sound judicial discretion of the trial court. *Strickland v. State,* 37 Ariz. 368, 294 Pac. 617; *Commonwealth v. White,* 271 Pa. St. 584,. 115 Atl. 870; *Prater v. State,* 107 Ala. 26, 18 So. 238; *Fry v. State,* 96 Tenn. 467, 35 S.W. 883; 20 Am. Jur. p. 309, Sec. 331.

We believe that the following quotation from *Wilder v. People,* 86 Colo. 35, 45, 278 Pac. 594 is applicable to the instant case:

"(8)c. The extent to which a defendant testifying in his own behalf may give to the jury his life's history, not directly connected with the charge, is generally discretionary with the trial court. Were it otherwise the question of guilt might be lost sight of in the trial of numerous collateral and immaterial issues. We cannot say that the court in the instant case abused that discretion in

excluding evidence of defendant's employment many years prior to the date of the charge and which could have but the remotest, if any, bearing on the question of his guilt. If defendant's legislative service does not fall within the rule, the fact that at least three of his character witnesses testified thereto without objection, and that it stands in this record undenied by word, fact, or inference, precludes any possibility of prejudice."

In the instant case no evidence of defendant's bad character was introduced by the People and evidence from apparently credible witnesses of his good character in the community in which he last resided was admitted, and its significance was properly included in an instruction. In the Wilder case, supra, we recognized that testimony, not relating to character, but of the life history of Wilder, not directly connected with the charge "is generally discretionary with the trial court."

■ The profferred testimony concerning the good reputation of defendant in Hooper, Colorado, some four or five years prior to the event which culminated in this trial had no probative value because of its remoteness. We observe no prejudice to defendant because this evidence was not admitted. Unless such judicial discretion is abused we will not reverse a cause on this account. In the instant case defendant had been absent from Hooper for a period of about five years before the date of the alleged crime. Testimony of other witness concerning the good character of defendant was admitted and this evidence was not controverted by the People. The court properly instructed the jury on the law concerning character evidence and gave defendant the benefit of the testimony which was adduced.

■ When this case was tried the entire theory of the defense was that the gun was accidentally discharged. The defense was excusable homicide—death by accident or misadventure. On this the court instructed the jury adequately to which instruction no objection was made by defendant's counsel. The instruction covered defend-

ant's theory of the case. No error is committed if a trial court refuses to give a requested instruction, but covers the subject matter of the refused instruction by one which is submitted to the jury. *Reigan v. People,* 120 Colo. 472, 210 P. (2d) 991; *Wilder v. People,* supra. In the instant case a proper instruction was given on excusable homicide by accident or misadventure, which instruction embraced elements not included in defendant's tendered instruction which was a statement of what defendant "contended." The instruction was in harmony with our holding in *Jarich v. People,* 58 Colo. 175, 143 Pac. 1092. The tendered instruction merely stated a "contention" without stating what constitutes excusable homicide by accident or misadventure. We perceive no prejudicial error in the trial court's refusal to give the tendered instruction.

It is argued by counsel for defendant that there was no evidence from which malice could be implied, or that the circumstances of the killing show an abandoned and malignant heart.

In *Baker v. People,* 114 Colo. 50, 160 P. (2d) 983, we said: "Malice should be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart."

The instant case was properly submitted to the jury to determine whether or not defendant was guilty of second degree murder. Taking the gun from his wife, as defendant did, under the circumstances of this case; shooting her and then himself, justified the jury in concluding that in so acting defendant had thrown off all self-restraint and pursued a course of conduct with complete disregard for the consequences of his acts.

The instruction on murder in the second degree properly advised the jury that "whether malice shall or shall not be implied under the circumstances of this case is a question for you to determine for yourself from the evidence."

The court correctly instructed the jury concerning

implied malice and we cannot substitute our opinion or conclusion concerning the application of the pertinent testimony for that of the jury whose province it was to apply the evidence under the instructions and render its verdict.

■ Without objection, other than the motion of defendant's counsel that the jury should be instructed to find defendant not guilty, the trial court instructed the jury on voluntary and involuntary manslaughter. It is now contended that the instruction on voluntary manslaughter should not have been given because there was no evidence of "provocation." Suffice it to say there was an argument, resulting from deceased's demand that defendant leave the premises occupied by his wife. She got the weapon, and it is plain that these parties were not in a calm state of mind when the killing took place. Whether or not there was provocation depended upon the evidence as disclosed by the entire record. Whether there was sufficient provocation to reduce the crime to manslaughter was a question to be determined by the jury under appropriate instructions. *Baker v. People,* supra. Whether the circumstances as disclosed by the evidence in the instant case amounted to statutory "provocation" was not a matter of law but a question of fact to be determined by the jury from all the evidence under appropriate instructions.

Implied malice must of necessity be established by all the facts and circumstances surrounding the crime. The perpetrator may testify as to his state of mind and heart at the time of the homicide, but the jury can do no more than resolve the matter of implied malice from the attendant facts and circumstances shown by the evidence which convince the jury beyond a reasonable doubt that the killing was murder in the second degree. Implied malice cannot be established as readily as a date on a calendar or the color of the clothing worn by the deceased at the time she met her death.

■ Defendant's counsel filed an amendment to the

motion for a new trial which concerned itself with a claimed error on the part of the trial court in permitting the district attorney to question defendant on cross-examination regarding the so-called Archina shooting. Nowhere in the original or amendment to the motion for new trial did counsel for defendant raise any question concerning the conversation of the witness Emmile A. DeBell with defendant on the afternoon of February 12, 1954, regarding the Archina shooting. That point was not brought to the attention of the trial court, hence may not be considered here. The only objection made by defendant's counsel to the tesitmony of this witness concerning the Archina episode was that the questions were "leading" and that the answers were "not responsive."

The record does not show what the Archina shooting was, it merely related a conversation or discussion between the witness and defendant concerning some unidentified event about which the parties had heard. This evidence had no probative value. It added nothing to the case of the People and detracted nothing from the case of the defendant, who was in no way prejudiced thereby. Our latest pronouncement concerning the introduction of such testimony, when it appears that it was not prejudicial, is found in *Walker v. People,* 126 Colo. 135, 248 P. (2d) 287, which cites with approval *McQueary v. People,* 48 Colo. 214, 110 Pac. 210, and *O'Loughlin v. People,* 90 Colo. 368, 10 P. (2d) 543.

There being no prejudicial error in the record, the judgment is affirmed.