STATE of Missouri, Respondent,

v.

Edward Lee CLEMMONS, Appellant.

No. 55401.

Supreme Court of Missouri,
Division No. 1.

Dec. 14, 1970.

John C. Danforth, Atty. Gen., Frank P. Cihlar, Asst. Atty. Gen., Jefferson City, for respondent.

Daniel J. Matula, R. Bruce Sears, Kansas City, for appellant.

HIGGINS, Commissioner.

Edward Lee Clemmons, charged by information with robbery, first degree, by means of a dangerous and deadly weapon, was convicted by a jury which assessed his punishment at twenty years' imprisonment. Sentence and judgment were rendered accordingly. §§ 560.120, 560.135, V.A.M.S.

On January 8, 1969, Alice (Mrs. H. D.) Mayer was present in Hart Mayer's Coins, Stamps, and Particulars, a business establishment owned by Mrs. Mayer and her husband at 7445 Broadway, Kansas City, Missouri. Also present in the store was an employee, Mrs. Gladys Sanders. During the noon hour the defendant came into the

store and told Mrs. Sanders he had a coin collection to sell. Mrs. Sanders summoned Mrs. Mayer to the front of the store to discuss the offer with the defendant. The defendant placed a black attaché case on the counter, opened it, removed a paper bag containing a gun, and said, "This is a holdup." Pursuant to the armed directions of the defendant, Mrs. Mayer gave him $76 in cash from the cash drawer and $225 in silver dollars. The defendant then stated he was "going to take her as a hostage" and directed her to drive him away from the scene in her car. Mrs. Mayer drove a few blocks from the scene and drove her automobile into a house, after which defendant ran. Mrs. Mayer flagged a car and was driven to a nearby police station where, within a few minutes, she identified defendant as her assailant from a photograph. Mrs. Sanders also identified defendant through a photograph as the robber, and both ladies identified the defendant in a lineup on the day of the robbery and at trial as the man who came into the store and robbed it at gun point January 8, 1969.

James W. Smith found a black leather attaché case near where Mrs. Mayer wrecked her car. It contained numerous silver dollars and other money, as well as a written note stating, "Holdup. Do as I ask and you won't get hurt."

Claude J. Prather, a mechanic at a repair shop near the automobile accident scene, identified defendant as the man who came into his shop at approximately 12:30 p. m., January 8, 1969, and asked for a pair of trousers because a dog had torn the trousers he was wearing. There was a dog kept in the yard of the premises where Mrs. Mayer wrecked her car.

Both Mrs. Mayer and Mrs. Sanders gave descriptions to the police which were broadcast and they resulted in the arrest of defendant at a gasoline station next door to the repair shop.

While in the custody of Sergeant Melvin Largent of the Kansas City Police Department, enroute from the 63rd Street Station to headquarters, defendant told the sergeant, after receiving the "Miranda warning," "I don't understand why that woman wrecked that car. I told her over and over that I wouldn't hurt her. I guess that she was just scared. I think I have said too much now. I had better shut up."

Appellant does not question the sufficiency of the evidence and the foregoing statement supports the jury's verdict. State v. Keeney, Mo., 425 S.W.2d 85; State v. Johnson, Mo., 420 S.W.2d 305; State v. DeLuca, Mo., 448 S.W.2d 869.

■ Appellant's only complaint with respect to his trial is that the court erred "in prohibiting the defendant from testifying as to his biographical background so that the jury would have some information upon which to assess their sentence and such an error constituted a violation of * * * due process * * *."

The complaint arose from proceedings which transpired immediately upon the close of the state's case and out of the hearing of the jury:

"MR. BACH (defense counsel): Your Honor, * * * I instructed Mr. Clemmons to view the evidence as it came in, and then we will discuss whether he will take the stand, and he has indicated that he desires to take the stand. I am personally against his taking the stand, and I desire over the noon hour to speak to him as regards whether he will take the stand.

\* \* \* \* \* \*

"THE COURT: At this time, out of the presence and the hearing of the jury, the Court wishes to go into the matter of such evidence as may be offered on the behalf of the defendant. Counsel has indicated that the defendant will have no testimony to offer other than his own personal testimony. Now, Mr. Bach, you perhaps may wish to make a statement in that connection?

"MR. BACH: Yes, Your Honor. I would like you to know for the record that

I have spoken to Mr. Clemmons, the defendant in this case, and he and I have both reached an agreement that it would be in his best interests to take the stand but to testify as to his family background, his upbringing, and his age, and his own personal family, the fact that he has three children and a wife, and the fact that he comes from a family of three brothers and three sisters and a mother and father, who are still presently alive, and the fact that they all live together. This is the type of testimony that Mr. Clemmons—and I am in agreement—desire to have him testify to when he takes the stand. I feel that it is incumbent that the jury hear this evidence for the reason that it is anticipated by myself that the Court will instruct them in regard to the form of verdict and if they were to find Mr. Clemmons guilty it would then be instructed to assess his punishment, and I feel that in assessing punishment they must know what the defendant's background is so that they can individualize his sentence and not be sentencing just a thing or a defendant, and this is the basis of discussing between myself and Mr. Clemmons in regard to his taking the stand.

"MR. MITCHELL (prosecuting attorney): Your Honor, I will object to any of those questions on the basis that none of it relates to the case at issue. * * *

"THE COURT: The first question to me, of course, is whether this defendant thoroughly understands his rights * * * that no person shall be compelled to testify against himsef in a criminal cause. * * * Nor shall he be compelled in any criminal case to be a witness against himself, and (the statute) is largely a section of qualification, and not disqualification or privilege, that no person shall be incompetent to testify as a witness in a criminal case. Do you understand, Mr. Clemmons, that you cannot be required to testify in this case if you desire not to testify? THE DEFENDANT: Yes, sir, Your Honor. THE COURT: And you understand that if you do wish to testify that you can do so? THE DEFENDANT: Yes, sir. THE COURT: And it is with the knowledge of this that you wish to be a witness? THE DEFENDANT: Yes; sir.

"THE COURT: That brings us to the second question as to the scope of the testimony. Perhaps ordinarily we would not have at this time the scope of the testimony outlined, but it occurs to the Court that the character of this defendant is not at issue in this case, but were it in issue, character cannot ordinarily be proved by specific acts but only by reputation in the community in which an individual lives. So the proffered testimony appears to be directly incompetent. The Court does not desire, and it is unwilling, to deny this witness, this defendant, the right to be a witness in his own cause, but if it is to be a biographical data about his own background * * * the mere fact that the jury under the circumstances must pass on punishment if they first find that the defendant is guilty does not change the picture on this. * * * In order to avoid any awkwardness about the matter, I think that perhaps it would be best at this time out of the presence and the hearing of the jury, to make an offer of proof in this regard, which will be available for appellate and any other review, that there be of this matter in the future.

"MR. BACH: Fine, Your Honor. The defense would like to offer the following questions that would be propounded to Mr. Clemmons if he were to take the stand. The following questions I list them under nine categories, but several other questions may come up under each of the nine. His name and his age, birth date, his present address, and his address prior to that—the fourth one is whom does he live with, and it is anticipated that he will answer, 'Wife, mother, three brothers and three sisters and a stepfather.' It is anticipated that the next question would be, 'What type of home is it?' and his answer would include the layout of the home. That is three bedrooms, that it is close to 13 people living in a 3-bedroom home on a split level. The fifth question would be, 'Are you married?'

and his answer would probably be, 'Yes.' 'How long?' 'Three years.' 'How many children?' 'Three.' 'What are their sexes and ages?' The answer to that would be, 'I have three boys, one two years old, one one year old, and one six months.' 'What is your education?' will be the sixth question, and his answer would be, 'I have finished the tenth grade at Central High School but I dropped out to go to the Service at 17 with the consent of my mother.' And the seventh question would be, 'What service did you enter?' 'I entered the Army,' would be the answer, 'and I served between September of 1964 to November of 1965.' I would ask, 'How were you discharged?' 'Under medical reasons.' The eighth question would be, 'Is your mother or father living?' and his answer would be, 'Yes.' 'Where?' His answer would be, 'Kansas City, Missouri.' Nine, repetition of the fourth question, 'Are your three brothers and four sisters alive?' and he would answer, 'Yes. They live with me and my mother at my mother's house.' And 'Are you the oldest?' 'Yes, I am the oldest.' 'Who is the youngest?' And his answer would be, 'My youngest sister is 4 years old, and she is the youngest of the seven.' * * *

"MR. MITCHELL: I would have no objection to his name, to his age, to his present address. * * * The others I would object to on the grounds that they were strictly biographical data of this defendant and there is nothing in them that touches on any of the issues in this case. * * *

"MR. BACH: Your Honor, again it is my contention that were the jury to find Mr. Clemmons guilty they would have to most definitely assess his punishment. To assess one's punishment, whether by Court or by jury, certainly entails knowing something of the biographical background of the man that you are sentencing, to know that he has three children, that he supports them, and that they rely on him, and that he has a wife, and he has a good home life, and if he is close to his brothers and sisters, and the fact that he has a mother and father, who live with him, and they all live in the same home, and the fact that he has lived in Kansas City, Missouri, for 14 years, but I could go on, Your Honor, and I think that this is correctly bearing on the possibility of what type of a sentence that the jury were to bring back if a verdict of guilty were to be found. I feel that it is definitely relevant.

"THE COURT: The objection is sustained as to the questions 4 to 9, inclusive, the subject matter of which has been covered in the offer of proof, and the offer is refused as to 4 to 9, and their various subject questions. The defendant will be allowed to testify as to the first three questions, having to do with his name, age, address, and I believe the former address. I do want to be absolutely sure that his testimony is not intended to extend beyond what has been included in the offer of proof. MR. BACH: No, it is not, Your Honor. THE COURT: Then it is your option, Mr. Bach, in light of the Court's ruling, as to whether you wish to place him on the stand and with the offer having already been made have his testimony terminate at that point.

"MR. BACH: Your Honor, I feel that it would be extremely facetious of me if I were to continue, and I feel that it would be best in light of the decision by this Court which, of course, I take definite exception to—my advice is that if Mr. Clemmons were not to take the stand because the jury would be more confused—just to name his present name and address and— THE COURT: I think that you are correct, but the option is the defendant's option. MR. BACH: Correct, but my advice to him is not to take the stand.

"THE COURT: Then let the record show in light of the Court's ruling on the proffer of proof that the defendant elects not to take the stand.

"MR. BACH: Do you agree with my recommendation on this, Mr. Clemmons? THE DEFENDANT: Yes, sir. MR. BACH: You prefer not to take the stand

in light of the Court's ruling? THE DEFENDANT: Yes.

"THE COURT: Then there will be no other testimony on behalf of the defendant? MR. BACH: No, Your Honor.

"MR. MITCHELL: Could I ask Mr. Clemmons a question? THE COURT: Yes. MR. MITCHELL: You realize that if you did take the stand that you would have a right to testify as to any matters touching upon this crime? THE DEFENDANT: Yes, sir. MR. MITCHELL: And you still don't want to take the stand? THE DEFENDANT: No, I will go along with my attorney.

"DEFENDANT RESTS

"THE COURT: Then let the record show that the evidence is closed and we are prepared now to submit the case to the jury."

The defendant's rights as a witness are guarded and provided by constitution and statute:

Article I, Section 19, 1945 Missouri Constitution, V.A.M.S. (and similarly Amendment V, United States Constitution), provides "That no person shall be compelled to testify against himself in a criminal cause * * *," and Section 546.260, V.A. M.S. (in relief of the disability at common law of an accused to testify in his own behalf), provides that "no person shall be incompetent to testify as a witness in any criminal cause or prosecution by reason of being the person on trial * * *; provided, that no person * * * shall be required to testify, but any such person may, at the option of the defendant, testify in his own behalf, * * * and shall be liable to cross-examination, as to any matter referred to in his examination in chief, and may be contradicted and impeached as any other witness in the case * * *."

The right against self-incrimination under Article I, Section 19, remains inviolate unless and until an election to testify under the statute causes such right to be waived; and the right to testify under the statutory provision likewise may be waived. It is clear from the record in this case that the defendant, after testing the discretion of the court and being fully advised of his rights and his exposure to cross-examination, positively and affirmatively elected not to exercise his right to testify in his own behalf. Accordingly, it cannot be said that the court "prohibited" him from testifying.

Appellant appears to argue, however, that such election was prompted by the court's refusal to receive his proffered questions and answers. It is clear also from the record that the proffer consisted entirely of biographical data which was irrelevant and immaterial on any issue of the case, including punishment. See, e. g., State v. Edmondson, Mo., 371 S.W.2d 273, 277 [9, 10], where there was no error in refusing to permit defendant to testify that he was married, had four children, and that his wife was in the courtroom; State v. Butler, Mo.App., 309 S.W.2d 155, 156–157 [1], where an offer to prove that defendant's father and mother separated before he was born and that he was raised in a bachelor household, was properly excluded because it had nothing to do with the issues on trial; People v. Smith, 13 Cal.2d 223, 88 P.2d 682, 684 [3], where objections to questions nearly identical to defendant's proffer were properly sustained because such ruling was within the discretion of the trial court to exclude defendant's history wholly disconnected to the crime for which he was on trial; People v. McGill, 82 Cal.App. 98, 255 P. 261, 265 [12], and State v. Taylor, 293 Mo. 210, 238 S.W. 489 [3, 4], where it was not error to exclude proof of defendant's military service on the ground it was not material. The rationale of such rulings is that a defendant has no right to testify to immaterial and irrelevant matters simply because such evidence might cause a jury to feel more kindly toward him rather than to weigh the turpitude of the offense, and perhaps, therefore, to assess a punishment more favorable to him. State v. Edmondson, supra, People v. Moretti, 6 Ill.2d 494, 129 N.E.2d 709, 730 [33]; and the extent

to which a defendant may testify to his life history not connected with the charge in question is lodged in the discretion of the trial judge, Wilder v. People, 86 Colo. 35, 278 P. 594, 598–599 [10–11], Lutz v. People, 133 Colo. 229, 293 P.2d 646, 649 [2–4].

In an effort to support an argument that he was abused by the trial court, appellant cites Brady v. Maryland, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215, "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment * * *." No application of this authority is demonstrated because the record contains no showing of any evidence in the hands of the prosecution which might have favored defendant on any issue of guilt or the matter of punishment.

There is no contention that the trial judge did not accord defendant "fair play," due process, and the right to be heard in the sentencing procedure to call for a discussion of appellant's citations on those matters.

Judgment affirmed.

HOUSER, C., not sitting.

WELBORN, C., concurs.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the court.

HOLMAN and BARDGETT, JJ., concur.

SEILER, P. J., concurs in result in separate concurring opinion filed.

SHANGLER, Special Judge, concurs in result and concurs in separate concurring opinion of SEILER, P. J.

SEILER, Presiding Judge (concurring in result).

I concur in the result reached in the principal opinion. However, I am doubtful about the stringency of the language in the principal opinion against the jury receiving any evidence that bears primarily on punishment. This is not the approach used when a judge assesses punishment, and I doubt if it sensible to use it with a jury. Our rules provide for a judge to receive information about defendant's " * * * characteristics, his financial condition, his social history and the circumstances affecting his behavior as may be helpful in imposing sentence * * *", Rule 27.07(b), V.A. M.R. A judge would have had before him all the information covered by questions 4 to 9 inclusive. If this is important to a judge in assessing punishment fairly, why is it not equally important and necessary that the jury have a basis for enlightened evaluation as to where punishment should be set—consistent with the public's good and defendant's own—particularly where the statutory allowable range is so vast as here—five years to life?[1] It is becoming increasingly evident that some guidance should be made available to a jury in its assessment of punishment, once guilt has been found. A determination with such lasting consequences should not be left to an uninformed decision or even whim.

---

1. The state waived the death penalty.