No. 21244.

LARRY WASHINGTON *v.* THE PEOPLE OF THE STATE OF COLORADO.

(405 P.2d 735)

Decided September 13, 1965. Rehearing denied October 4, 1965.

116

Samuel J. Merlo, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, FRANK E. HICKEY, Deputy, JOHN P. MOORE, Assistant, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE PRINGLE delivered the opinion of the Court.

THE defendant, Larry Washington, brings writ of error from a judgment entered upon a jury verdict finding him guilty of murder in the second degree of one Henry Vigil.

The defendant is a full-blooded Ute Indian. On Thursday, October 11, 1962, he was living in Towaoc, Colorado, the headquarters of the Ute Mountain Tribe. During the morning of that day, while in Towaoc, he drank a quart of wine. Some time before noon, the defendant, Raymond Frost, Rosemary Mills and Washington's sister, Mary Ellen Washington, drove to Cortez, Colorado, to wash his laundry. When they left Cortez, they drove to Mancos, Colorado. There, sometime about noon, they purchased some beer.

They next drove to Durango, Colorado, and then proceeded on to Bayfield, Colorado. Between Mancos and Bayfield, the defendant drank at least a quart of beer; perhaps more. They all arrived in Bayfield about 2:30 o'clock in the afternoon. While the others drove on to Ignacio, Colorado, the defendant remained on in Bayfield. In Bayfield, the defendant went to the Pioneer Bar and drank "all the time" until the others returned for him.

The four then went back to Ignacio, to the home of Maude Alire, the defendant's oldest sister. They arrived there about 4:00 P.M., and stayed on for about fifteen or twenty minutes. Maude Alire testified that Washington appeared intoxicated at that time. Upon leaving Maude Alire's home the group decided to go to the Tee Pee Lounge, a tavern in Ignacio. Washington stayed there until around 9:00 P.M. He states that he did not remember how much he drank during this period, but testified that "as soon as I finished I would want another."

About 9:00, the defendant left the Tee Pee and went to the Ignacio Furniture Store, broke in and stole a rifle, a shotgun and shells for both. He then proceeded to the house of one Judy Eagle. He stayed there a short

time, and then walked to his mother's house, which was nearby, because "that is where I automatically go when I get drunk."

Washington's mother's house had not been occupied for some time, as his mother lived in Towaoc. The house, however, had been broken into frequently during the period of its vacancy. On this occasion, Washington went to the back door, and found it open. He testified that as he walked in, he heard a noise which sounded like some footsteps in the corner of the room. He could not see who or what made the noise because the house was dark. He immediately fired the rifle, which he was holding at his side, in the direction of the noise.

According to his testimony, after he had fired a couple of shots he ran back outside the house to see if "somebody might come out of the house." He testified that when no one did, he assumed no one had been inside. He then hid the rifle and shotgun and returned to the Tee Pee.

The evidence showed that at the time of the shooting, one Henry Vigil had been sitting in the corner of the room into which the shots were fired and that he had been hit by at least five bullets. His body was discovered in a chair in the corner, on Saturday, October 13.

For reasons unexplained in the record, Washington eventually made his way to Farmington, New Mexico, about noon on Friday, October 12. He was found there on Sunday, October 14, by La Plata County, Colorado officers and was brought by them to the La Plata County jail.

The next morning, Monday, October 15, Washington was taken to the District Attorney's office in Durango. About 9:00 o'clock in the morning, he talked with Ralph Cloud, a former member of the Ute tribal police force and later a deputy sheriff. During his conversation, Washington related the details of his actions on October 11.

The defendant was charged with first degree murder

in an information filed on October 16. The trial began on April 15, 1963. The defendant was a witness on his own behalf. On April 19, the jury brought in a verdict of guilty of second degree murder. Washington was sentenced to a term of 15-30 years at the state penitentiary.

The defendant raises four arguments for our consideration: (1) it was error to allow Ralph Cloud to testify concerning the statements made by Washington to him, for the reason that Washington was denied his constitutional right to the assistance of counsel during their conversation; (2) Cloud's testimony should not have been admitted into evidence because Washington was never taken before a Justice of the Peace, as required by Rule 5, Colo. R. Crim. P., to be advised of his rights to remain silent while he was questioned, and to have the assistance of counsel during questioning; (3) it was error to admit into evidence the rifle used in the shooting because an unbroken chain of custody, from the time it was found to the date of trial, was not shown by the prosecution; and (4) the evidence was not sufficient to support a verdict of second degree murder. No argument that Washington's statement or confession was made involuntarily has been presented.

I.

In connection with Washington's first argument, we are called upon to interpret *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977, the most recent pronouncement of the United States Supreme Court on the subject of confessions made by an accused person.

In that case, Danny Escobedo was arrested and brought to the police station for questioning about the murder of his brother-in-law. During interrogation, the police rejected repeated requests by the accused to see his retained attorney, who was waiting in the next room. His attorney also had made numerous requests to see his client, and they too were denied. The police did not warn Escobedo of his right to remain silent. After several hours of interrogation, Escobedo made certain state-

ments which implicated him in the crime. He was convicted of first degree murder.

The United States Supreme Court, in reversing the conviction, held that:

"* * * where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. at 342, 83 S.Ct. at 795 and that no statement elicited by the police during the interrogation may be used against him at a criminal trial."

The defendant contends that since he was not advised of his right to remain silent and his right to counsel, Ralph Cloud should not have been allowed to testify as to his admissions, and the conviction must therefore be reversed.

In our view, *Escobedo* does not require that result. In the first place, Ralph Cloud was in no way connected with law enforcement at the time of his conversation with Washington. It is true that he had once been on the tribal police force, and that he became a deputy sheriff some time after the trial took place. But when he spoke with Washington at the District Attorney's office, it was not as a law enforcement officer. Nothing in the record even indicates that Cloud was acting as an agent for the police at the time the statements were made to him. No police interrogation had been conducted prior to this time, nor was any being conducted at the time Cloud spoke to Washington. It is

clear from the record that Cloud was speaking to Washington as a trusted friend and that during their talk Washington voluntarily told Cloud of the events of October 11. The rule laid down in *Escobedo* is concerned with coercive *police* tactics during *interrogation* and is therefore not applicable to Cloud's testimony. See *State v. Unsworth* (Ore.), 402 P.2d 507.

■ Moreover, and completely decisive, is the fact that Washington took the stand himself, and repeated substantially the same story he had told to Cloud. He made no effort to explain away his statements to Cloud which, in fact, were exculpatory, or to show that they were not accurate in any respect. This action was apparently taken to persuade the jury that he was guilty of a lesser offense than first degree murder; and it was successful. This situation was not one where he was required to take the stand in order to refute the effects of his pre-trial statements. Clearly, when the defendant elected to repeat to the jury his pre-trial statements, he waived every objection he might have urged to other proof by the prosecution of the same or similar statements. *Moya v. People,* 88 Colo. 139, 293 Pac. 335; *Honda v. People,* 111 Colo. 279, 141 P.2d 178; *State v. Unsworth, supra; State v. Dotson* (Ore.), 396 P.2d 777.

II.

■ Under Rule 5, Colo. R. Crim. P., an officer making an arrest without a warrant is required to take the arrested person before the nearest available Justice of the Peace within a reasonable time. Among other things, the Justice of the Peace must inform the accused of his right to counsel, his right not to make a statement, and that any statement made by him may be used against him. Washington contends that the testimony of Ralph Cloud should not have been admitted, because he was never taken before a Justice of the Peace and advised of his rights.

This contention stands on the same footing as the contention that Cloud's testimony was prohibited by the

*Escobedo* case. The defendant took the stand, when he had a right not to, and repeated the substance of his statements to Cloud. Under such circumstances, the defendant waived any objection he may have had to the admission of the testimony. *State v. Dotson, supra.*

### III.

Washington also contends that the trial court should not have received into evidence People's Exhibit 3, which was identified as the murder weapon, because the People failed to establish an unbroken chain of possession of the rifle from the time that it was found to the date of trial.

The location of the rifle after its discovery outside the Tee Pee Lounge was shown by the prosecution. Washington bases his objection on the fact that during the time it was kept in a locked closet in the town hall of Ignacio, two people had keys to the closet, but only one of them testified.

Washington urges a more stringent rule of evidence than either the law or common sense require. In order to establish the relevance and materiality of real evidence, it must only be connected in some manner with either the perpetrator, the victim or the crime. To be admitted, it must be shown to be what it purports to be, and its character must be as purported. 2 Wharton, *Criminal Evidence*, § 675 (12th ed. 1955). It is only where it is not possible to establish the identity in question by a single witness that a chain of evidence should be established. *Id.* § 665. Here, Washington himself testified to the identity of the rifle. Proof as to its custody in the meantime can hardly add to its identification. *State v. Christie*, 243 Iowa 1199, 53 N.W.2d 887. The exhibit was properly admitted.

### IV.

Finally, the defendant argues that the evidence is not sufficient to support the verdict of guilty of second degree murder, in that the evidence showed that he was intoxicated and shot in fear, without intent to kill.

124

 Murder consists of the unlawful killing of a human being with malice aforethought. First degree murder is the deliberate and premeditated killing of a human being with express malice aforethought. Second degree murder consists of an unlawful killing with implied malice aforethought, but without premeditation and deliberation. *Smith v. People,* 142 Colo. 523, 351 P.2d 457; *Tate v. People,* 125 Colo. 527, 247 P.2d 665; C.R.S. '53, 40-2-1, 3. Malice is implied when no considerable provocation appears, or when the circumstances of the killing show an abandoned and malignant heart. C.R.S. '53, 40-2-3.

 There can be no doubt that Washington was intoxicated at the time of the shooting. However, evidence of intoxication is admitted only for the purpose of determining whether the accused was capable of premeditation and deliberation. *Ingles v. People,* 92 Colo. 518, 22 P.2d 1109; *Brennan v. People,* 37 Colo. 256, 86 Pac. 79. Even if lack of deliberation and premeditation, because of intoxication, is shown, second degree murder can be proved upon a showing of implied malice in the killing.

The question presented here, then, is whether sufficient evidence was presented to justify submission of the issue of implied malice to the jury. If there was sufficient evidence, we of course cannot overturn the jury's finding.

 Implied malice must of necessity be established by all the facts and circumstances surrounding the crime. It cannot be established as readily as a date on the calendar, or the color of the clothing worn by the victim at the time of the crime. The perpetrator may testify as to his state of mind at the time of the homicide, but the jury is not bound by this statement and may consider the attendant circumstances in resolving the matter. *Lutz v. People,* 133 Colo. 229, 293 P.2d 646.

The evidence here shows that, contrary to Washing-

ton's testimony that he fired the rifle only twice, he actually shot at least seven times, for that many spent shells were found on the floor of the house. Furthermore, it is clear that he shot while aware that the noise he heard could have been caused by a person. When asked why he shot after he heard the noise, he testified that he thought it was a Wilfred Watts, "or other Spanish guys." Apparently Washington was afraid of these people because of an altercation which had occurred earlier in the evening at the Tee Pee.

In addition to the direct testimony of Washington, there is circumstantial evidence from which malice can be implied. The seven empty shells were all found on the floor very close to the chair in which Vigil was shot or into which he fell after being shot. Of the two doctors who testified at the trial, one stated that he believed that two shots were fired from the door, and the rest from a closer distance. The other doctor stated that he believed that one shot was fired four inches from Vigil's chest.

▇ With testimony such as this in the record, we cannot say that, as a matter of law, the evidence was insufficient to support a finding of implied malice.

The judgment is affirmed.