## No. 22696.

TOMMY LOFTON *v.* THE PEOPLE OF THE STATE OF COLORADO.

(450 P.2d 638)

Decided February 10, 1969. Rehearing denied March 10, 1969.

PAUL V. EVANS, for plaintiff in error.

DUKE W. DUNBAR, Attorney General, JOHN P. MOORE, Deputy, PAUL D. RUBNER, Assistant, for defendant in error.

*En Banc.*

MR. JUSTICE MOORE delivered the opinion of the Court.*

WE will refer to plaintiff in error as the defendant. He was accused of armed robbery with intent, if resisted, to maim, wound or kill the victim. Upon conclusion of the trial to a jury he was found guilty. Motion for a new trial was overruled and defendant was sentenced to a term of not less than four nor more than seven years in the state penitentiary.

As grounds for reversal of the judgment his attorney presents argument on three points, to wit:

1. The trial court erred in failing to grant a continuance when a witness failed to appear during the trial.

2. The trial court erred in admitting in evidence a

*Retired Supreme Court Justice sitting under assignment by the Chief Justice under provisions of Article VI, Section 5(3) of the constitution of Colorado.

knife which was in the possession of the defendant when he was taken into custody.

3. The identification of the defendant by the victim, under all the circumstances disclosed by the record, was not of "sufficient weight" to justify its admission in evidence.

The victim of the robbery, one Tommy Hayes, was a soldier stationed at Camp Carson in El Paso county, Colorado. Between 11:30 and 11:45 on the night of April 30, 1966, he and a friend were waiting in a bus station in Colorado Springs. He testified that a person, who thereafter became the accomplice of the defendant, approached them and asked if they would "like a ride back to Fort Carson for bus fare. We said yes. So we got in the car with him. There was another guy already in the car." He testified that one of the two men said he wanted to stop by a girl's house for a moment to which Hayes and his friend agreed. Thereupon defendant drove out to Prospect Lake and "pulled up and stopped." Hayes then described the robbery as follows:

"So the passenger pulled a gun on my buddy. I looked over at the gun and looked back and the driver was coming back over the seat like so with a knife, put it up against my throat, asked me how much we had. We said we didn't know exactly. He said where is it? In my wallet. Let me see it! Handed him my wallet, took it out and handed my wallet back to me. My buddy had his money in his front pocket. He pulled it out and handed it to the passenger and told us to get out so we got out.

\* \* \*

"Q. And when this knife was — would you describe to the jury in a little more specific detail where this knife was in relationship to your body?

"A. Knife was lying right across here (indicating).

"Q. Was it touching you?

"A. Yes."

After getting in the car at the Nevada street bus

station and driving out to Memorial Park where the robbery took place, the car was stopped "five to ten minutes" during which time the crime was committed. Seventeen dollars was taken by the defendant from Hayes' billfold. The victim described the car as follows: "A. It was a maroon Pontiac convertible with white top and in the car on the dash was some wool fuzzy like stuff, had a Fort Carson sticker on it."

The identification of defendant was:

"Q. Is there anyone in the courtroom at this time who was in the car when you were taken out to Memorial Park?

"A. Yes, this fellow sitting right over here.

"Q. And where was he seated in the car?

"A. Under the wheel.

"Q. Was he the driver of the vehicle?

"A. Yes."

After the robbery Hayes testified that:

"A. We got out of the car, walked up to the top of the hill, parking lot, people there. We asked them to take us to the phone booth. They said okay, took us to the phone booth, and we just got out of the car and the phone booth wasn't working. We didn't know that, so we took off and we started walking down the street and about that time a policeman came along and we stopped him and told him about it."

His companion had taken down the license number and they gave it to the police officer. The information carried on the police pickup was that the victims were not sure about the letters but were certain about the numbers on the license tag. The victim further testified:

"Q. Would you describe what you could identify as far as that knife is concerned for us?

"A. Well, pretty good sized knife, big knife — I'd say — seven to eight inches long, handle and blade part too. The knife wasn't real sharp as if it had been whenever it nudged against my throat, it would cut. It wasn't real sharp or anything like that.

"Q. Did you have a mark on your throat?

"A. Yeah, across my throat, imprint.

"Q. Is there any question in your mind that this is the person that was in that car at that time and place?

"A. No question in my mind, that is him."

Following the arrest of defendant, Hayes identified him at police headquarters as being one of the robbers. The police officer who was "flagged down" by the two victims of the robbery corroborated the testimony given by Hayes.

Officer Huscher testified that he placed the defendant under arrest on May 1, 1966, at 6:30 P.M. He took a knife from the person of defendant, which was admitted as Exhibit A. Defendant was driving a car that answered the description given by Hayes —

"a '61 Pontiac convertible, maroon, had a white top. * * * The numbers were definitely the ones that was carried on the pickup."

The witness stopped the defendant and arrested him upon observing that the car he was driving answered the description of the one for which he was looking, as well as the fact that the defendant also fit the description of the robber as given by the victims to the police. In describing the "fuzzy dash" on the car the witness said:

"Q. Tell us about this fuzzy dashboard. What did you see? Describe it.

"A. As I recall it has the fuzz on it which was maybe three quarters, half, three quarters of an inch long and it covered the top part of the dash. It wasn't down on the panel part, the padded part of the dash."

This "fuzzy dash" corresponded to the description given by the victim Hayes.

The defendant called two witnesses, Terry Dunn and James Daniels, Jr., who testified that they spent the night of April 30, 1966 with the defendant visiting various bars and attending parties at certain girls' homes. These witnesses were soldiers at Fort Carson and were

well acquainted with the defendant. They testified that defendant was at Marie Jones' house or at the home of Ivory, another girl friend, at all times when the robbery of Hayes was committed. They named others in attendance at these "parties" including a Sergeant Williams, a girl known as "Slim" and one Harvey Holt. At least three persons were mentioned who could have been called to account for the whereabouts of the defendant at the time of the robbery. The following took place:

"MR. EVANS: May it please the Court, at this time defendant would call Harvey Dwight Holt or Dwight Harvey Holt.

(Pause)

"THE BAILIFF: He is not present."

Following considerable discussion defendant's attorney moved as follows:

"* * * We would ask the Court further to grant the defense a continuance until such time as Mr. Holt can be located and brought into court to testify, or in the alternative, for a mis-trial in this matter on the ground that a subpoenaed witness of such importance to the defense has not appeared and a continuance of trial setting until such time as his presence can be secured."

The court denied the motion and stated that:

"As I understand this witness would be a corroborating witness as to an alibi on the part of the defendant, but from the information that has been stated to the Court this witness was headed for Chicago the last time his whereabouts was known. * * *"

\* \* \*

"* * * there is evidence in the record, if the jury wants to believe it, from the other witnesses, on the part of the defendant that he was not present when the complaining witness says that this alleged crime was committed * * *."

The defendant took the stand and denied committing the robbery and told substantially the same story as that testified to by Dunn and Daniels.

## QUESTIONS TO BE DETERMINED

First. *Did the trial court err in denying the motion for continuance?*

 This question is answered in the negative. The granting or denial of a continuance is a matter which rests in the sound discretion of the trial judge, and his ruling thereon will not be disturbed unless it is plainly erroneous. *Sharp v. People,* 90 Colo. 356, 9 P.2d 483; *Abshier v. People,* 87 Colo. 507, 289 Pac. 1081. The witness Holt who did not appear was intended to be a third alibi witness. The critical period of time was adequately covered by witnesses who were called. Holt could have provided nothing more than a third source of testimony covering the time already accounted for by Dunn and Daniels. It is clear that at least three other persons residing in Colorado Springs could have been called by defendant to verify his alibi, if indeed his story was true. They were not called and the record discloses no effort to secure their appearance. Holt's testimony could have been, at best, merely cumulative.

Second. *Did the court err in admitting in evidence the knife taken from the defendant upon his arrest?*

 This question is answered in the negative. The knife taken from the defendant fits the general description, given by the victim, of the knife placed against his throat by the defendant during the robbery.

"In order to establish the relevance and materiality of real evidence, it must only be connected in some manner with either the perpetrator, the victim or the crime." *Washington v. People,* 158 Colo. 115, 405 P.2d 735. It was for the jury to determine whether the knife found on defendant was used in the robbery.

Third. *Did the trial court err in holding that the "identification" of the defendant under all the circumstances was sufficient to warrant submission to the jury the question of defendant's participation in the crime?*

 This question is answered in the negative. The victim who identified the defendant had an unusually

long time to observe him: When he got into the car at a well-lighted bus station; as they drove out to Memorial Park; and during the robbery itself when the defendant held a knife to the victim's throat there was ample time for him to make certain that he recognized his assailant. In *Ortega v. People,* 161 Colo. 463, 423 P.2d 21, this court said, *inter alia:*

"If a witness has the capacity 'to observe, recollect, and communicate, and some sense of moral responsibility' his testimony should be left for jury evaluation."

The judgment is affirmed.

MR. JUSTICE KELLEY not participating.