**STATE of Missouri, Respondent,**

v.

**Jessica Lynn CLARK, Appellant.**

**No. 21825.**

Missouri Court of Appeals,
Southern District,
Division One.

Dec. 7, 1998.

Susan L. Hogan, Appellate Defender, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Michael P. Barry, Asst. Atty. Gen., Jefferson City, for respondent.

CROW, Judge.

Appellant, charged with murder in the first degree, § 565.020,[1] was tried by jury and found guilty of murder in the second degree, § 565.021. The jury assessed punishment at life imprisonment. The trial court entered judgment per the verdict. This appeal followed.

Appellant's sole point relied on is:

"The trial court erred in refusing to allow Appellant to present the testimony of surrebuttal witnesses Leann Blakey and Shirley Campbell, because the court's ruling violated Appellant's rights to present a defense, to due process of law, and to a fair trial, as guaranteed by [sundry federal and state constitutional provisions], in that the testimony of Ms. Blakey and Ms. Campbell was relevant to the issue of Appellant's mental state at the time of the offense. Both witnesses could have supported Appellant's and her family's reports to Dr. Dorothy Lewis that Appellant had experienced physical and emotional abuse as a child. Such evidence tended to prove a disputed fact related to a principal issue in the case, since Dr. Lewis's opinion as to Appellant's mental state was based in part on Appellant's history of repressing her anger at the abuse she suffered both as a child and as a young adult."

Appellant does not challenge the sufficiency of the evidence to support the verdict, hence this opinion summarizes only the evidence pertinent to Appellant's claim of error.

Appellant rented an apartment and moved into it in the summer of 1995. In December 1995, Shawna Daly began residing there with Appellant. By January 1996, several other people had begun residing with Appellant and Daly.[2]

Brandy Uber resided in an apartment across the hall from Appellant's apartment. Sometimes, Appellant slept in Uber's apartment because there was nowhere for Appellant to sleep in her own apartment. Appellant complained to Uber that Daly "ruined"

---

1. References to statutes are to RSMo 1994.

2. For brevity and clarity, this opinion refers to the individuals mentioned in it by their respective surnames. No disrespect is intended.

Appellant's apartment and never did "anything to clean [it]."

Appellant's landlord eventually told Appellant she had to expel the other occupants from her apartment or move out herself. Appellant told the landlord she would "be out by the 1st of February [1996]."

Appellant was still occupying the apartment February 1, so her landlord gave her an eviction notice. Appellant assured the landlord she would "be out Saturday."

On Friday afternoon, February 2, Appellant and Daly were alone in Appellant's apartment. Appellant's account of what occurred, as revealed by her to investigators, is set forth in the ensuing five paragraphs.

Daly was asleep on the floor. Appellant "began running bath water." At that point, Appellant "had the urge to kill [Daly]."

Appellant decided to "knock [Daly] out with a crutch which was in the house and then drown her in the bathtub." Appellant struck Daly on the head with the crutch "approximately ten times." Daly sat up and yelled at Appellant to stop. Appellant did.

After an interval of "several minutes," Appellant decided to hit Daly on the head with a "candlestick holder." Appellant delivered the blow while Daly was "sitting on the floor." After the blow, "there was blood coming from [Daly's] head."

Appellant concluded she would be unable to knock Daly out, so Appellant picked up an "Ace type bandage which was lying on the floor next to [Daly]." Appellant wrapped the bandage around Daly's throat, then "tied it and held it." Appellant picked up a second bandage from the floor and wrapped it around Daly's throat.

Daly "struggled for approximately five minutes," then quit breathing. Appellant drug Daly's corpse into the bathroom and "placed it in the bathtub full of water." Later, Appellant "went back in and drained the water."

An autopsy revealed Daly died of strangulation. There were three "deep bruises" in the scalp and "defensive" bruises on the arms and wrists.

At the instance of Appellant's lawyers, Dorothy Otnow Lewis, a psychiatrist, evaluated Appellant. Lewis concluded Appellant "does not suffer from neurological problems" and has no "mental disease or defect." Instead, Lewis determined that Appellant "was in an altered state at the time that she committed this act." Lewis explained, "I think my colleagues may call it a dissociative state."

Appellant was described by Lewis as a "compassionate, caring, giving person, who was never angry." Asked whether there was anything in Appellant's background that could have caused her "altered state," Lewis recounted that Appellant's father was an "extremely violent" alcoholic, Appellant's mother had "some serious psychiatric problems," and Appellant's stepfather (whom Appellant's mother married upon divorcing Appellant's father) was a harsh disciplinarian who beat Appellant. According to Lewis, Appellant's co-workers had seen Appellant "come to work with black and blue marks."

Lewis told the jurors that Appellant had to do the housework, the cooking, and the laundry. If her mother or stepfather was dissatisfied with the results, Appellant had to do the tasks "all over again."

Endeavoring to explain why Appellant killed Daly, Lewis hypothesized that after years of suppressing her anger about the way she was treated, Appellant "suddenly snapped, and all of the rage that she had been suppressing for years ... erupted." Lewis surmised Appellant's outburst was triggered by the rowdy conduct of the people who "camped" in her apartment, the "mess" they habitually made which she had to clean up, and the imminence of her eviction.

On cross-examination, the prosecutor asked Lewis whether she had any "objective report or evidence" to corroborate the alleged abuse inflicted on Appellant by her father, mother and stepfather. Lewis responded:

"I believe that two of the co-workers considered, when [Appellant] was eighteen years old ... making a report to DFS ...

I believe it was Ms. Lakey[3] and Ms. Campbell—and then they decided not to, because they thought she was too old and that probably DFS would not become involved. I consider that independent, outside confirmation."

After the completion of Lewis's testimony, Appellant's lawyer, outside the hearing of the jury, told the trial court:

"I would propose to call Leann Blakey and Shirley ... Campbell ... as witnesses for the defense. It's my understanding that [the prosecutor] opposes that based on conversations yesterday. They would be called to verify the abuse situations that Dr. Lewis talked about."

The prosecutor objected because Blakey and Campbell "were not endorsed by the defense for trial" and their testimony would be "a collateral matter." The prosecutor added:

"[W]hether or not these people saw bruising or black eyes is irrelevant because they can't testify as to where they came from. And the fact that the defendant told them that she was abused ... that's hearsay."

The trial court denied Appellant's lawyer's request to present Blakey and Campbell as witnesses.

Later in the trial, the prosecutor presented Richard Denny Wetzel, a clinical psychologist, as a rebuttal witness. Wetzel recounted that he examined Appellant a month before trial. He concluded Appellant did not have a mental disease or defect at the time she killed Daly. Asked whether Appellant was "suffering from an altered state," Wetzel replied: "I said that an altered state simply means your mood changed. She didn't have anything that will explain or contribute to this, other than that she was angry on the day when she did it."

Wetzel testified that prior to Appellant's evaluation by Lewis, Appellant was evaluated by "Dr. Burstin" and "Dr. Hutchinson." According to Wetzel, Appellant did not indicate to either Burstin or Hutchinson that she had been abused as a child.

After Wetzel's testimony, the prosecutor announced he had no further rebuttal evidence.

Appellant's lawyer thereupon told the trial court:

"I have two surrebuttal witnesses, Leann Blakey and Shirley Phillips [sic], that I'd like to call on the issue of child abuse. I believe that was brought up on rebuttal, which allows me to bring them in on surrebuttal."

The trial court asked what the testimony of the two prospective witnesses would be. Appellant's lawyer replied:

"Shirley Phillips [sic] and Leann Blakey never actually saw the abuse, [Appellant] just told her [sic] about the abuse and told her [sic] about having to take the other kids and hide from her mother during her rages."

The prosecutor objected because Blakey and Campbell could not "testify that they saw any abuse." The prosecutor continued:

"All they can say is what [Appellant] told them and that they may have seen some bruises on her, that [Appellant] told them that [her stepfather] gave her a black eye, which is hearsay, and that would be irrelevant."

Responding to the prosecutor's objection, Appellant's lawyer argued:

"I think [the prosecutor] brought up this when he attacked Dr. Lewis' testimony on the abuse of [Appellant] when he had Dr. Wetzel testify and talk about how he didn't think there was a lot of physical abuse in the home."

The trial court denied Appellant's lawyer's request to present Blakey and Campbell as surrebuttal witnesses.

In studying Appellant's claim of error (quoted at the outset of this opinion), this court deduces that Appellant does not assign error in the trial court's denial of Appellant's lawyer's request to present Blakey and Campbell as witnesses during Appellant's case-in-chief. Instead, this court infers Appellant complains only about the trial court's denial of Appellant's lawyer's request to

3. Inferably, the Leann Blakey referred to in Appellant's claim of error.

present Blakey and Campbell as surrebuttal witnesses to counter Wetzel's testimony.

This court draws that inference from (1) the averment in Appellant's point relied on that the trial court "erred in refusing to allow Appellant to present the testimony of surrebuttal witnesses Leann Blakey and Shirley Campbell," and (2) an assertion in the argument portion of Appellant's brief that the trial court "abused its discretion in refusing to allow defense counsel to call Leann Blakey and Shirley Campbell to testify, to rebut Dr. Wetzel's testimony that [Appellant] did not report being abused as a child until she was evaluated by Dr. Lewis." For convenience, this opinion henceforth refers to the ruling complained of by Appellant as "the surrebuttal ruling."

■ The first contention in Appellant's point relied on regarding the surrebuttal ruling is that the ruling "violated Appellant's rights to present a defense."

Neither the point nor the argument following it identifies the "defense" which the surrebuttal ruling allegedly barred Appellant from presenting.

As noted earlier, neither Lewis nor Wetzel testified that Appellant was afflicted with a mental disease or defect when she killed Daly. Appellant did not request a jury instruction hypothesizing the defense of not guilty by reason of mental disease or defect excluding responsibility as defined in § 552.030, evidently recognizing there was no evidence to support such a defense. *See: State v. Larson*, 941 S.W.2d 847, 854–55 (Mo. App. W.D.1997), and cases cited there. For convenience, this opinion henceforth refers to such a defense as "a § 552.030 defense."

Appellant does not claim that the surrebuttal testimony she wanted to adduce from Blakey and Campbell would have supported a § 552.030 defense. Any such argument would be meritless. Consequently, the sur-

rebuttal ruling did not deprive Appellant of a § 552.030 defense.

Apparently, the "defense" Appellant sought to raise through Lewis's testimony was that because of Appellant's "altered state," she did not deliberate before killing Daly, but instead killed Daly impetuously in a fit of rage. That assumption is buttressed by the following passage from the argument portion of Appellant's brief: "The centerpiece of [Appellant's] defense was that she exploded in a rage, which resulted in ... Daly's death, after years of repressing her anger at being abused first by her family and later by people she considered to be her friends."

Because deliberation is an element of murder in the first degree, *State v. Brown*, 867 S.W.2d 530, 535 (Mo.App. W.D.1993), and the absence of deliberation separates murder in the second degree from murder in the first degree, *id.*, Appellant's lawyer endeavored to convince the jury that Appellant did not deliberate before killing Daly.[4] During final argument, Appellant's lawyer asserted:

"We have never said [Appellant] didn't intend to kill [Daly]. The question is, did she deliberate on it, cool reflection.... [H]ere we have this nineteen year old girl, with no prior history whatsoever, committing this horrible offense. And the question is why. The question is was it cool deliberation.... [S]he wasn't in her right mind, she was not herself, she was not thinking in a manner that would support first degree murder. Cool reflection. Knowing what you're doing....

You should read all the jury instructions, [the prosecutor] is absolutely right. First degree murder or second degree murder.[5] If you take out the element of cool deliberation you have second degree murder. No one has argued with you that she didn't intend to kill [Daly]. We said that from the beginning. The question is was it cool reflection? That's why there are dif-

---

4. The purpose of that strategy is obvious. Had the jurors found Appellant guilty of murder in the first degree, their punishment options would have been limited to the death penalty or imprisonment for life without eligibility for probation or parole. § 565.020.2. The range of punishment for murder in the second degree is imprisonment

for a term of years not fewer than ten nor more than thirty, or life imprisonment. §§ 565.021.2 and § 558.011.1(1).

5. The trial court gave no manslaughter instruction. Appellant assigns no error in that regard.

ferent degrees of murder. All murders are not the same.

The law requires the state to prove it was cooly reflected upon beyond a reasonable doubt. [The prosecutor] has that burden to prove that to you. And I submit to you he has not done so. . . .

Cool reflection is not there. And under the instructions the judge read to you, and that you will take back with you, it says unless you find, beyond a reasonable doubt, each and every one of you agree, that this was a cooly reflected upon act, not was it a planned act, not did you think about it for a period of time, five minutes, ten minutes, was it cool deliberation, cool reflection. If you all don't agree, it is not first degree murder and you cannot return a verdict of guilty of murder in the first degree.

If you agree on the other two elements of the case, that she did it, that she intended to kill her, then that's second degree murder. It's not first degree murder. I submit to you he has not proven his burden, he cannot prove his burden, and this is not a first degree murder case."

The jurors obviously found Appellant's lawyer's argument persuasive. As reported in the first paragraph of this opinion, the jury found Appellant guilty of only murder in the second degree, the lowest degree of homicide submitted by the trial court.[6]

It is thus evident that the "defense" Appellant sought to present through Lewis's testimony, i.e., Appellant's "altered state" prevented her from deliberating about killing Daly, was successful without the testimony Appellant wanted to adduce from Blakey and Campbell. This court therefore rejects Appellant's contention that the surrebuttal ruling "violated Appellant's rights to present a defense."

■ The only other possible way in which the surrebuttal ruling could have adversely affected Appellant was in regard to punishment. In the argument portion of Appellant's brief, Appellant declares: "The jury never heard the testimony of these two 'non-family-members' [Blakey and Campbell] that

[Appellant] used to have to hide from her mother. Such evidence, if presented to the jury, could have resulted in the jury assessing a punishment of less than life in prison."

■ In evaluating that complaint, this court begins with the holding in *State v. Edmonson*, 371 S.W.2d 273, 277 (Mo.1963), that evidence offered solely for the purpose of creating sympathy for an accused is properly excluded. The opinion declared:

"The fact that defendant was married and had children, the number and ages of the children, and whether defendant's wife was in the courtroom, were altogether immaterial facts ... which had no bearing upon the question whether defendant was guilty. . . . The only purpose of offering such evidence would be to engender sympathy for the defendant."

*Id.* at [10].

*Edmonson* was cited with approval in *State v. Clemmons*, 460 S.W.2d 541, 545 (Mo. 1970), where the Supreme Court of Missouri held the trial court did not err in barring the accused from testifying about "biographical data." The opinion explained:

"The rationale of such rulings [as *Edmonson*] is that a defendant has no right to testify to immaterial and irrelevant matters simply because such evidence might cause a jury to feel more kindly toward him rather than to weigh the turpitude of the offense, and perhaps, therefore, to assess a punishment more favorable to him."

*Clemmons*, 460 S.W.2d at 545[3].

It is clear from *Edmonson* and *Clemmons* that Appellant is not entitled to reversal on the ground that the testimony she wanted to adduce from Blakey and Campbell might have created juror sympathy and thereby induced the jurors to assess a lesser sentence.

■ Furthermore, Appellant's lawyer conceded Blakey and Campbell "never actually saw the abuse," and could testify only as to what Appellant told them "about having to take the other kids and hide from her mother during her rages."

---

6.  Footnote 5, *supra*.

The State maintains that any testimony by Blakey or Campbell regarding statements made to them by Appellant concerning abuse by her father, mother or stepfather, would have been inadmissible hearsay.

The State is correct. A hearsay statement is any out-of-court statement offered to prove the truth of the matter asserted. *State v. Chambers*, 891 S.W.2d 93, 102[21] (Mo. banc 1994). Hearsay is generally inadmissible. *Id.* at 102–03[22].

■ Testimony by Blakey or Campbell regarding statements made to them by Appellant concerning abuse by her father, mother or stepfather, offered to prove that the abuse indeed occurred, would have been vulnerable to a hearsay objection. Appellant cites no authority to the contrary. Exclusion of inadmissible evidence is not reversible error. *Cf. State v. Vaulx*, 806 S.W.2d 688, 689[1] (Mo. App. E.D.1991).

For the reasons set forth in this opinion, this court holds Appellant's point relied on is without merit.

Judgment affirmed.

PREWITT, P.J., and PARRISH, J., concur.